```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF GEORGIA
                         AUGUSTA DIVISION
```

United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )    Case No. 1:25CR62
                               )
Rony Denis,                    )
                               )
          Defendant.           )
_____)

```
                   EXCERPT OF DETENTION HEARING
                 BEFORE THE HONORABLE BRIAN K. EPPS
                    UNITED STATES MAGISTRATE JUDGE
                 WEDNESDAY, SEPTEMBER 17, 2025; 5:52 P.M.
```

FOR THE PLAINTIFF:

     Patricia G. Rhodes, Esquire
     George J.C. Jacobs, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Steven H. Sadow, Esquire
     Steven H. Sadow, LLC
     260 Peachtree St. NW Suite 2502
     Atlanta, Georgia 30303
     (404)577-1400

     David Stewart, Esquire
     Crowder Stewart, LLP
     Post Office Box 160
     Augusta, Georgia 30903
     (706)434-8799

TRANSCRIBED FROM DIGITAL RECORDING BY:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

1          (Court resumes at 5:52 p.m.)

2          THE COURT:  All right.  Mr. Sadow, anything we need to

3   address before we resume with the government's case?

4   Mr. Sadow?

5          MR. SADOW:  No, Your Honor.  No, Your Honor.

6          THE COURT:  All right.  Mrs. Rhodes.

7          MRS. RHODES:  Thank you, Your Honor.  So, Your Honor,

8   as I continue to proffer I want to just sort of recap very

9   quickly that the man did not use an alias.  He literally stole

10  someone else's identity and lived under it for 42 years.  The

11  government has no idea who he is.  There is not a scintilla of

12  doubt that the defendant who joined the Army in 1983 using the

13  name Rony Denis, the DOB 8/23/59, and the A# 024708198 and

14  Social Security No. 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 is not the defendant who came

15  into -- it's not the Rony Denis who came into the court of

16  Miami in October -- 18th of October, 1980.

17          So while the government's position would be that we

18  believe that this alone is sufficient to deny him bond, but

19  there is a lot more information here and so I want to talk

20  about the next prongs -- well, first I want to talk about

21  another factor for risk of flight and that is that the

22  defendant has access to considerable funds which could fund

23  flight, and so I want to -- I've got a PowerPoint that I

24  believe it's not on the big screen, but I believe everyone is

25  able to see and -- can everybody in the courtroom see the

1   screen?  Everybody who needs to see it.  Does Your Honor ---

2          THE COURT:  Yeah, I believe so.

3          MRS. RHODES:  Okay.

4          THE COURT:  Yes.

5          MRS. RHODES:  The first few screens are a timeline

6   that reiterate the information we just heard from Officer Card.

7   So I am going to skip right to the next screen in ---

8          THE COURT:  That timeline would be very helpful.

9          MRS. RHODES:  I'm sorry, Your Honor?

10          THE COURT:  That timeline -- that's the timeline

11   of ---

12          MRS. RHODES:  I'm sorry.  That was the timeline of the

13   immigration file.

14          THE COURT:  Right.

15          MRS. RHODES:  And I'm happy to have Your Honor look at

16   it.  So ---

17          THE COURT:  It would be a helpful reference point for

18   me and probably for Mr. Sadow, too, and so maybe if you could

19   give that to me in some form in a filing --

20          MRS. RHODES:  I would be happy to.

21          THE COURT:  -- and, Mr. Sadow, of course you'd have a

22   chance to respond to that timeline, too, if you wished to do

23   so.

24          MRS. RHODES:  I will be happy -- I will mark that as

25   an exhibit and it can just be our next exhibit.

1          THE COURT:  Okay.

2          MRS. RHODES:  Whatever our number is.

3          THE COURT:  Sure.

4          Where are we at in numbers, Mrs. Capps?

5          THE CLERK:  This will be Government Exhibit 7, I

6     believe.

7          THE COURT:  Seven.

8        (Government's Exhibit No. 7  is entered into evidence.)

9          MRS. RHODES:  Okay.  And, essentially, it rolls

10    through the dates and the information that we have already

11    discussed.  So I don't want to beat a dead horse --

12          THE COURT:  Okay.

13          MRS. RHODES:  -- but I would like for the Court to

14    have that.  Okay.  So we're talking about the considerable

15    access to funds.  Between 2018 and 2020 this defendant had

16    unreported income to the IRS of over $5.7 million which forms

17    the basis of the Counts 24 through 26 in the Indictment.  In

18    that same time period he received funds from House of Prayer

19    accounts that exceeded $2.8 million.  The investigation has

20    turned up more than 180 bank accounts used by the House of

21    Prayer Christian Church and the Bible Seminaries, the LLCs that

22    they have used in connection with the movement of properties,

23    and the personal accounts that have been used to move funds

24    around.

25          So you have the House of Prayer accounts, the Bible

1    Seminary accounts, the LLC accounts and the personal accounts,

2    and through all of those accounts -- I say all of those

3    accounts -- we've identified 180 that were associated with

4    members in the group, but we have information -- some of those

5    are closed now, but we have information from all of those

6    accounts that backup the funds that have been filtered through

7    to the defendant.

8         The defendant and his co-defendants just, basically,

9    play a shell game with these funds coming in and moving money

10   around through numerous accounts to disguise that much of it

11   lands in the hands of the defendant.  As the Court can see the

12   unreported income was $5.73 million for three years of

13   taxation.

14        THE COURT:  All right.  So when you say that 5.7, that

15   -- you've seen all of those transfers between all the shells,

16   but what you've identified here -- the 5.7 -- is money that

17   you've seen move from the alleged shell companies to him in his

18   personal account?

19        MRS. RHODES:  This is -- well, this is -- on his

20   individual income taxes that were filed -- either marital

21   income taxes -- this is the number that the IRS has come up

22   with as being income that he -- income to him that he failed to

23   report on his income taxes for the years 2018, '19 -- the

24   taxable year of '18, '19 and '20.

25        THE COURT:  Okay.  And the 2.8 million -- remind me

1   again what that number is.

2           MRS. RHODES:  Yes, sir.  So the -- that 2.8 million is

3   probably some of those funds might be included in that 5.7

4   number because it is -- it is funds that came directly to the

5   defendant from House of Prayer accounts.

6           THE COURT:  Okay.  All right.

7           MRS. RHODES:  And here's the next slide is an example

8   of that.  So the House of Prayer Christian Churches of America

9   Phebe Ruth Foundation -- this is a check on April 11 of 2018 to

10  Rony Denis for $800,000.  I want to let the Court know who

11  Phebe Ruth Denis is.  Phebe Ruth Denis was -- is a member of

12  the House of Prayer.  She was married.  She was formerly known

13  as Julie Bowles.  She was married to an individual by the name

14  of Adam Bowles.  A divorce occurred.  I don't remember the

15  exact day, but it was -- the exact year -- but I think it was

16  around 2012'ish, but I am not 100 percent sure of that date and

17  she then moved into the house to live with Rony Denis and his

18  wife Marjorie and their child Mariah.  She then changed her

19  name to Phebe Ruth Denis.

20          The wife, Marjorie Denis, is -- they are in the middle

21  of a divorce and the child -- they do not live with him

22  anymore.  Phebe Ruth Denis is believed to still live with the

23  defendant and this foundation was set up purportedly as a

24  charitable foundation.  This $800,000 that went to Mr. Denis

25  was then used to pay for the purchase of the home in West Palm

1   Beach, Florida and Martinez, Georgia, and you can see how the

2   flow of this money went and that's how the $800,000 was

3   ultimately spent, and, incidentally, these two houses are

4   multi-million dollar houses.

5              THE COURT:  Okay.  When you say the money was used to

6   purchase, you mean as like a down payment; right?

7              MRS. RHODES:  I'm sorry?

8              THE COURT:  When you say he used the $800,000 for

9   these two homes you mean -- that wasn't all the proceeds used

10  to purchase them?

11             MRS. RHODES:  No, no, no, no.

12             THE COURT:  That was just like a down payment?

13             MRS. RHODES:  Correct.  I mean, you can see the

14  amounts of the money and how they flowed here.

15             THE COURT:  Okay.

16             MRS. RHODES:  There was an attempted purchase of a

17  different home in Florida that did not go through.  So then

18  that 272,500 was diverted toward the payment or the purchase of

19  the Heronwood property also in Florida.

20             THE COURT:  Okay.

21             MRS. RHODES:  The defendant also during the course of

22  this criminal conduct received illicit VA funds; that is, funds

23  that the House of Prayer Bible Seminary was not entitled to and

24  these funds flowed, as the Court can see, from the top of the

25  page -- the funds flowed from money coming in from the VA to

1    the House of Prayer Bible Seminaries.  Those funds then went

2    through in this case three different House of Prayer bank

3    accounts to then finally a fourth -- actually, I take that

4    back.  I think it's two.  There's two accounts on that second

5    line that are the same.  So it went into two House of Prayer

6    accounts from the VA funds, then into another House of Prayer

7    for Citizens account.  The money then came out to House of

8    Prayer BB&T account and to Centex Management which is one of

9    the LLCs that is -- has been set up through which many of these

10   rental properties -- some of the rental properties are owned,

11   if you will, by the Centex Management and some of the rental

12   income comes into Centex Management.

13         Anyway, that's where the funds flow and the funds then

14   flow to Joseph Fryar for the payment of two Rolls Royces, two

15   Bentleys, and a QX Infinity.  The 2016 Bentley was purchased in

16   the name of Casonia Fryar, but it is registered to -- the 2025

17   registration for this car is the defendant's West Palm Beach

18   address.  Casonia Fryar does not live at that address and, in

19   fact, Casonia Fryar has since left the House of Prayer.

20         It is interesting that this car is in her name because

21   even though Casonia Fryar and Joseph Fryar were living in the

22   Martinez area in a house rented by the House of Prayer, they

23   shared that house with a number of other couples and then it

24   was learned during the course of the investigation from

25   witnesses we spoke to that these couples moved to this home

1   that was rented by the House of Prayer where they shared the

2   house.  Each couple might have had a bedroom, but there has

3   been testimony that they were there to serve Rony Denis and

4   they would spend an inordinate amount of time at his home in

5   West Lake.

6           Furthermore, the defendant received daily reports and

7   information during the course of this conspiracy from Anthony

8   Oloans who sometimes goes by the nickname of Abdullah.  These

9   reports include a lot of things involved in this case like

10  log-in information on mortgage accounts.  We've identified over

11  200 properties that have been purchased and sold during the

12  course of this conspiracy which dates back to 2004.  So in the

13  materials that we have that Anthony Oloans would provide to the

14  defendant on a thumb drive either regularly -- sometimes

15  weekly -- I'm not -- it may have varied from day to day, but at

16  least weekly he would provide information to the defendant but

17  Anthony Oloans was in the Hinesville area.  The defendant being

18  in the Martinez area, he would mail or if somebody was coming

19  up transport these thumb drives up to the defendant and these

20  thumb drives have all this information that relate to, again,

21  log-in information on mortgage accounts which would include the

22  address.  It would include the name in which the mortgage would

23  be held.  It would include email addresses.  It would include

24  sometimes the security questions that are involved.

25          There is a spreadsheet of what this information is in

1    order to get into these -- electronically enter these accounts

2    online.  There will also be memos about what -- in all of this

3    material -- and it's thousands and thousands and thousands of

4    documents and in these materials there are important things,

5    but there is also very mundane things.  For example, Anthony

6    Oloans on a daily basis would report all of the calls that he

7    had to -- who he called "Helper Denis".  He would report them:

8    An incoming call from so and so, an outgoing call from so and

9    so, and he reported this on a daily basis.  All of those are in

10   this materials.

11        Nonetheless, he did -- Oloans did report important

12   things to the defendant -- in particular, relating to the

13   defendant's access to substantial financial resources.  I want

14   to note that before I go to the next slide the thumb drives had

15   a unique name to them or I should say the folders on the thumb

16   drives had a unique name and they were named hooch, H-O-O-C-H.

17   You're going to hear some recordings that I am going to play in

18   a little while and there will be references to "you need to

19   clean up the hooch, Oloans" or "Abdullah".  "You need to get

20   rid of the information in the hooch."  So that is -- it's an

21   important note to note that that was the way these folders were

22   labeled.  Okay.

23        From the information that was transmitted to the

24   defendant by Oloans on a regular basis this is one of the

25   documents and this is actually a two-page document.  I couldn't

1    fit the whole -- it is an Excel spreadsheet.  I couldn't fit it

2    all on one screen.  So I am going to have to go to the second

3    screen, but the top of this -- at the top of the screen it

4    indicates Pastor Denis's bank deposits, Bank of America --

5    three checking accounts -- last 24 months and then, of course,

6    at the last side of the column it shows the date and the amount

7    of the deposit and when we go to the next page which is the

8    bottom of this spreadsheet we see that in 12 months -- I'm

9    sorry.  In a two-year timeframe between April of 2017 and April

10   of 2019 that 1.88 -- more than $1.88 million was deposited into

11   Pastor Denis' bank accounts.

12          There is an additional document that came from the

13   same source and it relates to that spreadsheet but it

14   elaborates a little bit on that on May 5 of 2019 to Pastor

15   Denis Abdullah, also known as Oloans, submits this information

16   to him and he -- Anthony Oloans starts every one of these

17   emails or one of these documents with "Sir, I humbly submit the

18   following information for your review."

19          He gives the same date range as we saw in the

20   spreadsheet and it shows the Bank of America total which we've

21   already gone over $1,888,352.68 million but there is a second

22   bank account, a Wells Fargo which contained 1,865,250.00.  The

23   total of deposits in a two-year period into Pastor Denis's

24   account was $3.753 million.

25          THE COURT:  All right.  So let me ask you before you

1  move on -- so you've given me two different -- is this the same

2  two-year period that we're talking about for both sets

3  because I ---

4          MRS. RHODES:  Those two documents apply to the exact

5  same period.

6          THE COURT:  Okay.  So then you're saying there is a

7  total of 3.7 plus 1.8.  So, basically, $5.5 million flowing out

8  of these.

9          MRS. RHODES:  Oh, I'm sorry.  I'm sorry.  You're

10  talking about the tax charges?  So the tax charges are for ---

11          THE COURT:  Just back up a couple of pages.

12          MRS. RHODES:  Okay.  And I'm sorry if I'm ---

13          THE COURT:  That's okay.  No, no, no.  I just want to

14  make sure I understand.  One more page.

15          MRS. RHODES:  So it covers part of the taxable years

16  that are in the Indictment.  The taxable years are 2018, 2019,

17  and 2020.  So this would -- so the first, I guess, for about

18  eight months of 2017 which because this dates back to April of

19  2017 that portion, I guess, would not be included in our tax

20  count of the 5.7 million unreported income.

21          THE COURT:  Okay.

22          MRS. RHODES:  Does that make sense?

23          THE COURT:  No.  Just back up one.  The question I had

24  was different than that.  Back up one slide.  One more.  One

25  more.

1          MRS. RHODES:  One more?  One more?

2          THE COURT:  Yeah, it's this.  Okay.  So this is a

3    different time period and so when you give me the 5.7 from 2018

4    to 2020, is this different money flowing to him than the 1.8

5    and the 3.7 you just talked about or is it the same?

6          MRS. RHODES:  Your Honor, so that's a little difficult

7    for me to answer in specificity because of the amount of

8    information that is in the IRS spreadsheets from this.

9          THE COURT:  Sure.  Okay.

10         MRS. RHODES:  It is thousands of transactions and, I

11   mean, what I can tell you is that this 5.7 number comes from

12   the IRS analyst from their investigation.

13         THE COURT:  Okay.

14         MRS. RHODES:  The Excel spreadsheet that has Pastor

15   Denis at the top --

16         THE COURT:  Uh-huh.

17         MRS. RHODES:  -- followed up by that memo are items

18   that came from Anthony Oloans to Rony Denis.

19         THE COURT:  Okay.

20         MRS. RHODES:  As sharing information about here's the

21   status of our bank accounts.

22         THE COURT:  Okay.

23         MRS. RHODES:  And they're both sources of information

24   -- the IRS and Mr. Oloans -- are reporting to the defendant

25   regarding the amount of money flowing out of these various

1  organizations into his personal --

2          THE COURT:  Okay.

3          MRS. RHODES:  Accounts.

4          THE COURT:  Okay.

5          MRS. RHODES:  Correct.

6          THE COURT:  All right.  Thank you.  I won't interrupt

7  anymore maybe.

8          MRS. RHODES:  You know, I guess I want to reiterate

9  that the point, I guess that I -- and the reason for including

10  this in here is to show the access by Rony Denis alone -- the

11  defendant alone -- to a substantial amount of money at any

12  given time.  Okay.

13          So that kind of sums up the we believe that he is not

14  the person that he has been purporting to be for the last 42

15  years.  He has substantial income and we believe that he is an

16  extreme flight risk and if he were, in fact, to flee the

17  government would have no way to find him.  We have absolutely

18  no way to find him.  I don't think that any leg monitor or

19  house arrest or anything like that would ever accomplish what

20  needs to be accomplished in this case.

21          In addition to being an unknown person and serious

22  flight risk, the defendant also poses a serious risk of

23  obstructing or attempting to obstruct or threatening,

24  intimidating or injuring a witness or attempting to do so which

25  is the (B) factor of the (F)(2) section.  The factors, of

1  course, for that are exactly what the statute says.  There's

2  not really -- you just have to kind of look at the fact

3  specifics here and determine whether or not they rise to that

4  level and we believe that they do.

5       The risk is predicated upon a number of things that,

6  first of all, the influence that he has over congregants at the

7  House of Prayer is like nothing I've ever seen before and the

8  history -- he also has a history of violent behavior which

9  dates all the way back to his military days.  We don't know

10  what preceded the military things because we have no record of

11  him.

12       To begin with people who left the church were called

13  out as traitors.  I'm showing the Court -- this is a three-page

14  document but this would be the first page of that document.

15  When the search warrants were executed at the Bible Seminaries

16  this was one of the documents that were recovered and these

17  people left the church and some of them left under the cover of

18  darkness out of fear, but all of these people were -- are in

19  this list and this is -- this is the way that a person who

20  wants to leave this organization is portrayed.

21       The people -- some of these people who left were

22  stalked online.  Their pictures were spread around in the

23  church.  In the materials received by the government several of

24  the pictures include his soon-to-be ex-wife and his daughter.

25  At least one picture shows his daughter wearing pants with some

1    comment about how horrible that was and how wrong that was for

2    her to be wearing pants.

3            In addition to the reports that Oloans provided to the

4    defendant on the regular basis, he also provided an electronic

5    folder on those thumb drives titled "hooch" that contained

6    approximately 60 individuals' driver's licenses with other PII

7    information to include things like social security cards --

8    primarily driver's license, but there were at least 60 of them

9    in this folder.  He still has all of this information as we sit

10   here today.  This was not something that was obtained by the

11   government.  It was provided to the government and the

12   defendant still has access to it.  It has the names of all of

13   these people used in connection with mortgage fraud in this

14   case.

15           Other information material to the defendant being a

16   risk of obstructing or threatening and intimidating witnesses

17   are as follows:  One of the persons who was recording in the

18   courtroom just last week has left the House of Prayer and has

19   sought refuge in an undisclosed location.  He has contacted the

20   government and is fearful.  The defendant has a history of

21   obstructive conduct.  One former member who was attending the

22   Texas location was in South America on a mission trip when the

23   defendant ordered him to return to Texas so he could assist the

24   defendants Labat and Garcia with "scrubbing the VA student

25   files for an inspection that was on the horizon".  That witness

1  said after scrubbing the student files that contain false

2  information and false tuition statements which were provided to

3  the VA that he came to -- after the search warrants in the case

4  that person came to the defendant telling him that he wanted to

5  leave the organization and the defendant told him, "If you

6  fight me, I'll fight you back."

7        Another former member tells a similar story.  This

8  individual was recruited in the San Diego location of the House

9  of Prayer which doesn't have a Bible Seminary but it has a

10 church there and he moved to Hinesville to attend the House of

11 Prayer Bible Seminary.  He was very unhappy with the school and

12 so he disenrolled and at which point he began to be harassed

13 and received threats from other House of Prayer

14 representatives.  He reported that the defendant confronted him

15 about his disenrollment and told him, "I am not one you can

16 play with; you better be careful," and described him as a mob

17 guy.  He described the defendant as using the power of the

18 church to benefit himself.

19       Another witness was frightened to attend meetings with

20 the government and indicated she worried that if anyone knew

21 that they would try to have her killed.  This same person

22 recounted an encounter with the defendant in which she was so

23 scared that she urinated on herself.  Yet another member

24 indicated the defendant held meetings about "how to stay ahead

25 of the FBI".  One complaint alleged that the defendant taught

1   his congregation that if he instructed someone to eat or drink

2   something poisonous that they should obey him and that only God

3   could stop him.

4          Another former member of the House of Prayer and the

5   House of Bible Seminary -- I'm sorry.  Excuse me.  Of the

6   former members of the House of Prayer and the House of -- and

7   the Bible Seminary that we have spoken to, every single one

8   without fail -- all the former members that we've spoken to

9   indicate that Rony Denis is in charge.  Nothing happens without

10  his approval.  Nothing happens without his direction and he has

11  taken every effort to remove his name from anything associated

12  with it in an effort to try to get away with his crimes.  The

13  consistent theme is that he is the ultimate decision-maker on

14  literally everything, and if you don't follow his directives,

15  there are always consequences.

16         Judge, I have at this point some audio recordings

17  that ---

18         MR. SADOW:  One second, please.

19         THE DEFENDANT:  I'm feeling sick.  I'm feeling sick.

20         THE COURT:  All right.  What else do you have

21  Mrs. Rhodes?  Is that it?

22         MRS. RHODES:  I have some audio recordings that I want

23  to play.

24         THE MARSHAL:  Sit up.  Don't slide down.  Sit up for

25  me.

1          Everybody clear out.

2          Sit up for me.  You slid down on your own.  Sit up for

3    me.  What's going on?

4          THE DEFENDANT:  I'm feeling sick.  I am dehydrated.

5          THE MARSHAL:  Drink some water.  Drink you some water,

6    sir.  Hopefully, to be on the safe side, it's dehydration.

7          THE COURT:  Marshals, has he had a chance --

8          THE DEFENDANT:  I haven't slept for seven days.

9          THE COURT:  -- to use the bathroom and all that since

10   we've been in here?

11         THE MARSHAL:  Yeah, he's used the bathroom, sir.  Yes,

12   sir.

13         THE COURT:  Okay.

14         THE MARSHAL:  What was that, Mr. Denis?

15         THE DEFENDANT:  I haven't slept for seven days.

16         THE MARSHAL:  You haven't slept in seven days?

17         THE DEFENDANT:  No.

18         THE MARSHAL:  Okay.

19         THE COURT:  Mr. Sadow?

20         THE MARSHAL:  Okay.  You said you're feeling sick.

21   What kind of ---

22         THE COURT:  You were looking at me, Mr. Sadow.  I

23   didn't know if you had anything you wanted to share.

24         THE DEFENDANT:  I haven't slept.  I haven't slept.

25         MR. SADOW:  Could we approach for a minute maybe?

1    THE COURT:  Yeah.

2    THE MARSHAL:  You think this is from being tired?

3    THE DEFENDANT:  Say what now?

4    THE MARSHAL:  Do you think this is from being tired?

5    THE DEFENDANT:  No, I don't think so.

6    (A bench conference is held as follows.)

7    MR. SADOW:  I don't know what it is, His

8    Honorableness, but it appears at this moment that he's really

9    not in any condition that he's -- it's 6:20.  I don't know what

10    the Court wants to do.  It doesn't sound like you're going to

11    make a ruling today.

12    THE COURT:  No, I was going to take it under

13    advisement.  I mean, does he understand that it doesn't mean he

14    is going to go home today; right?  I mean, as long as we

15    haven't completed the hearing he is going to have to come back

16    and you're going to have to drive from Atlanta and all that.

17    MR. SADOW:  I don't mind.  Whatever I have to do, I

18    have to do.

19    THE COURT:  All right.  Well if you're telling me that

20    he's not in shape to continue today and we need to reconvene

21    next week, I don't see any harm in that.

22    Mrs. Rhodes, do you see any harm in that?

23    MRS. RHODES:  No.  Actually, since I have another one

24    tomorrow, I'm like ---

25    THE COURT:  Right.  She'd like to go home anyway.

1    Yeah, I understand.

2            MRS. RHODES:  Well, I mean, I would like to -- I mean,

3    I can come back and hopefully hit the button and finish the

4    presentation.

5            MR. SADOW:  How much more of it do you have?

6            MRS. RHODES:  So the recordings are about 30 -- I

7    think they're about 35 minutes.  It is like a bunch of

8    different little ones.  I think it is about 35 minutes.  The

9    rest of what I have to say could be done in ten minutes but ---

10           MR. SADOW:  But if they're recordings ---

11           THE COURT:  We want to give you ample time to respond,

12   too.

13           MR. SADOW:  But I've not heard -- I don't know what

14   the recordings say.

15           THE COURT:  Okay.

16           MR. SADOW:  So it might be better -- might be -- if

17   under the circumstances if the government shared the recordings

18   with me so that when I come back at least I have some idea of

19   what it is that I am discussing with the Court.

20           THE COURT:  I don't see anything wrong with that.

21   Let's just take a -- if everybody is in agreement that we

22   should just continue the hearing to another day, I'll let y'all

23   decide when that is and if you can give him this recording in

24   the meantime.

25           MR. SADOW:  Do you have -- I know you've made

1  reference to several people that in dealing with the

2  destruction of materials.

3          MRS. RHODES:  I am not giving the names over.

4          MR. SADOW:  Well ---

5          MRS. RHODES:  Not right now.  Not doing it.  These

6  people are terrified.

7          MR. SADOW:  I understand what your position is.  Is

8  there a way for you to provide me with what they've actually

9  said without names?

10          MRS. RHODES:  No.  I'm not providing -- you can

11  provide it from your 10 terabyte hard drive and I'll give you

12  -- I'm not -- this is -- if we weren't breaking today we would

13  be going through with this and --

14          MR. SADOW:  And I would still be asking.

15          MRS. RHODES:  -- but I'm not ---

16          THE COURT:  I think that's for another day.  If y'all

17  can't have an agreement on it and you want to file a motion,

18  that's fine, you know, to require disclosure of it and we'll

19  take that up.  That's a separate track from this.  We just want

20  to get through the detention hearing.

21          MRS. RHODES:  I mean, he's going to get -- he is going

22  to get it all.  He'll get it all unredacted, but I am not going

23  back -- I am not going back and providing information that I

24  proffered to the Court and that now he wants to take a break

25  and then go back and have that -- Judge, that is not in any

1    sense the way these hearings operate.

2         THE COURT:  Well, so I don't want to get too confused

3    on what we're dealing with here.  What you're telling me is

4    that you're going to give him -- the discovery will include the

5    names of ---

6         MRS. RHODES:  The discovery is going to be --

7         THE COURT:  Right.

8         MRS. RHODES:  It is going to be all unredacted.

9         THE COURT:  Right.

10        MRS. RHODES:  I mean, unless it is a minor victim.

11        THE COURT:  To me, we're on separate tracks.  One

12   track is trying to get through the detention hearing and reach

13   a ruling.  The separate track is discovery so you can prepare

14   for trial.

15        MR. SADOW:  Well, I am not quite sure I agree there.

16   There have been representations made and I am not suggesting

17   the government's representations are anything other than they

18   are, but in order for me under the circumstances to try to meet

19   (inaudible) on detention it seems to me since he's been

20   arraigned and discovery was due, then the least the government

21   can do is give me something other than what she says they say

22   if it is already in a format that I can review.  I don't care

23   if it's ---

24        THE COURT:  No, it's unfortunate because your client

25   is creating this delay because of alleged health symptoms and

1  now we're going to stop everything so we can engage in far more

2  discovery than we normally do for a bond hearing.  I am not

3  comfortable with any of that.  I want to get this bond

4  situation done as quickly as we can.  If he can't move forward

5  today, I'm glad to accommodate his health, but we're not going

6  to wait for all this information to be disclosed.  We just need

7  to move forward.

8          MR. SADOW:  I understand what Your Honor is saying.

9  We'll, obviously, wait when it's appropriate.  My -- it sounded

10  to me like she's got about half a dozen people that she's

11  referenced so far.

12          MRS. RHODES:  Judge, I'm not -- I am not going back to

13  my office and try to dig through thousands of interviews that

14  we've done.

15          THE COURT:  I ---

16          MRS. RHODES:  I've got another detention hearing

17  tomorrow.

18          THE COURT:  We're not going to do that.  I think it's

19  totally fair for you to give him what you've already prepared

20  for us to listen to in court.  That's it.  In terms of when we

21  reconvene we need to do that sooner than later, but, obviously,

22  it will be next week.  So ---

23          MRS. RHODES:  And, Judge, can I -- I'm sorry to

24  interrupt.  I don't know if the Court is aware.  I am now

25  starting to travel back and forth to Savannah like I did

1    before.  Can I -- you know, I have to be down there a few days

2    next week so my schedule is going to be kind of tight.  I am

3    covering some sentencings for David Estes on Monday here.  I am

4    going to Savannah Tuesday, Wednesday, Thursday.  So Friday is

5    the earliest I can do it.

6             THE COURT:  Are you good for Friday next week?

7             MR. SADOW:  May I look?

8             THE COURT:  Sure.

9             MR. SADOW:  The Jewish holidays are coming up.  That's

10   the only problem.  Next Friday is 26th?

11            MRS. RHODES:  I think so.

12            MR. SADOW:  I'm free.

13            THE COURT:  Okay.

14            MR. SADOW:  And I'll come early.

15            THE COURT:  You have no objection to us waiting a week

16   -- usually we do bond hearings the same day as the initial

17   appearance and arraignment so it's your client's right to a

18   speedy determination of these issues.  If you're fine tabling

19   it because of his health and this information that you want to

20   obtain until next Friday, I'm fine doing that, but it needs to

21   be clear on the record that you are requesting this continuance

22   and you do not deem it unreasonable that we reconvene next

23   Friday.

24            MR. SADOW:  I'll be glad to put that on the record.

25            MRS. RHODES:  And the information is what's in the

1  PowerPoint.

2          THE COURT:  Right, yeah, and the audio file.

3          MR. SADOW:  Are you going to be sharing the

4  PowerPoint?

5          MRS. RHODES:  I'll send it to you.

6          MR. SADOW:  Okay.  Great.

7          THE COURT:  Yeah, the PowerPoint and then the audio

8  recordings that you're going to use.

9          MR. STEWART:  It's already been marked as an exhibit.

10          MRS. RHODES:  So he wanted the first five pages.  I'll

11  just mark it and put it in.  That's fine.

12          THE COURT:  Okay.  What time do y'all want to

13  reconvene on Friday?

14          MRS. RHODES:  10 o'clock.

15          THE COURT:  You're coming from Atlanta.  Is 10 o'clock

16  good for you?

17          MR. SADOW:  It takes me two and a half hours.  If I

18  get out of there by 6, I'll be here by 8:30, 9 o'clock.

19  10 o'clock should be fine.

20          THE COURT:  Okay.  I have a haircut at 2 o'clock that

21  Friday.

22          MR. SADOW:  I don't have that problem anymore.

23          THE COURT:  I am five weeks late getting my hair cut.

24  I am five weeks late getting my hair cut and my wife is on to

25  me about this, but I will cancel it if I need to.  It's not a

1  big deal.

2       MRS. RHODES:  So I have a hair appointment next week

3  and I never -- I never cancel my hair appointment.  I'm sorry.

4  I will move, you know, mountains to make that happen.

5       MR. SADOW:  Are we going to start with the hair

6  appointments then?

7       THE COURT:  All right.  Well, should we call everybody

8  back in here and put this on the record?  I mean, it's being

9  recorded right now and we do have it on the record and the

10  defendant has left the room.

11       MR. SADOW:  I can state for the record that we are in

12  agreement and concur with the hearing being continued because

13  of the defendant's health.  It will be continued by agreement

14  until the Friday, September 26 at 10 a.m. and that the

15  government will turn over its PowerPoint and its tape

16  recordings.  Does that sound right?

17       MRS. RHODES:  Yeah, the -- and I have the recordings

18  embedded into the PowerPoint.  If it doesn't work because it

19  wasn't working here, but it worked in my office, you should ---

20       MR. SADOW:  As long as I get it in some form or

21  fashion, I'll ---

22       MRS. RHODES:  Okay.

23       THE COURT:  Sounds good?

24       MR. SADOW:  Does that cover for you?

25       THE COURT:  Yes.  Court's adjourned.

1          MRS. RHODES:  All right.  Thank you.

2          THE COURT:  Thank y'all much.

3          MR. SADOW:  Thank you.

4      (Bench Conference Ends.)

5          THE COURT:  Court is adjourned.  We're going to

6  reconvene and we put it on the record.  There is no reason to

7  bring anybody back in or do anything else.  All right.

8      (The hearing is concluded.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Lisa H. Davenport, Federal Official Court Reporter, in

5    and for the United States District Court for the Southern

6    District of Georgia, do hereby certify that pursuant to Section

7    753, Title 28, United States Code that the foregoing is a true

8    and correct transcript of record of the digitally-recorded

9    proceedings to the best of my ability and that the transcript

10   page format is in conformance with the regulations of the

11   Judicial Conference of the United States.

12

13

14                              _____

15                              Lisa H. Davenport, RPR, FCRR
                                Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25