**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:25-CR-62** |
| | ) | |
| **FNU LNU** | ) | |
|   **aka Rony Denis** | ) | |
| | ) | |
|        **Defendant.** | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER (DOC. 109)

NOW COMES the United States of America, by and through the United States Attorney, Margaret E. Heap, the undersigned Assistant United States Attorney and responds as follows to the Defendant's motion:

The Defendant seeks to overturn the Magistrate's Order of Detention pursuant to Title 18, United States Code, Section 3145(b), alleging that the "detention order should be revoked because conditions can reasonably assure the [Defendant's] appearance as required and the safety of any other person and the community." (Doc 109 at 1.)

In the instant case the Government sought detention pursuant to 18 U.S.C. § 1342(f)(2)(A) and (B), serious risk of flight, and a serious risk that such person will obstruct or attempt to obstruct justice, to threaten, injury or intimidate a witness or attempt to do so.

The Government submits that as to serious risk of flight, it has shown by preponderance of the evidence that no condition of combination of conditions will

assure the Defendant's appearance. The Government also submits that as to serious risk of obstruction or attempting to obstruct and securing the safety of other persons and the community, it has shown by clear and convincing evidence that no condition of combination of conditions will assure either. See *United States v. Giordano*, 370 F. Supp. 2d 1256 (S.D. Fla. 2005). Accordingly, the Government opposes the Defendant's motion.

After a hearing which spanned two days, at which the Government presented testimony of United States Customs and Immigration Service Officer Todd Card and a proffer, the Magistrate Judge agreed with the Government and with U.S. Probation, that no condition or combination of conditions could assure that the Defendant would not flee and could assure that the Defendant would not obstruct or attempt to obstruct justice, to threaten, injury or intimidate a witness or attempt to do so.

The Defendant's motion is entitle to *de novo* review.

Pursuant to 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a magistrate judge,...the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order" and the Court should rule on the motion "promptly." 18 U.S.C. § 3145(b). "[I]n this situation, the district court must conduct an independent review to determine whether the magistrate properly found that pretrial detention is necessary." *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). This "independent review" is de novo. *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("[W]e affirm the district court's denial of Gaviria's and Echeverry's request for a de novo hearing because the district court properly afforded de novo review of the magistrate's detention order.").
"At this point, the district court has two options." *King*, 849 F.2d at 490. "First, based solely on a careful review of the pleadings and the evidence developed at the magistrate's detention hearing, the district court may determine that the magistrate's factual findings are supported and that the magistrate's legal conclusions are correct." *Id.* "The court may then explicitly adopt the magistrate's pretrial detention order. Adoption of

the order obviates the need for the district court to prepare its own written findings of fact and statement of reasons supporting pretrial detention." *Id.*

Still, "the district court is to enter its own findings of fact where factual issues remain to be resolved." *Id.* But "when a motion to revoke or amend a pretrial detention order attacks only the magistrate's legal conclusion that pretrial detention is necessary, and no factual issues remain unresolved, the district court need not enter findings of fact when adopting the magistrate's pretrial detention order." *Id.*

*5 The second option allows the Court to acquire more evidence to make its detention determination. "If the district court, after reviewing the detainee's motion, determines that additional evidence is necessary or that factual issues remain unresolved, the court may conduct an evidentiary hearing for these purposes." *Id.* "In this instance, the district court must enter written factual findings and written reasons supporting its decision." *Id.*

"Of course, if the district court concludes that the additional evidence does not affect the validity of the magistrate's findings and conclusions, the court may state the reasons therefor and then explicitly adopt the magistrate's pretrial detention order." *Id.* at 490-91.

*United States v. Govoni*, No. 8:25-CR-299-VMC-NHA, 2025 WL 1997709, at *4–5 (M.D. Fla. July 18, 2025).

The Government contends that the record from the Magistrate Court, including the transcripts (docs. 99 and 100) and all of the exhibits introduced at the hearing, provide a sufficient basis to establish serious risk of flight, serious risk of obstructing, and danger to any person or the community. Further, the Government contends that the Magistrate Judge's legal conclusions were correct.

For those reasons, the District Court may explicitly adopt the Magistrate Judge's pretrial detention order, which obviates the need for the Court to prepare its own written findings of fact and statement of reasons supporting pretrial detention.

I.    **The Defendant is a Serious Risk of Flight because his identity is unknown, he has the financial means with which to flee, and upon conviction he could face a prison term that could result in prison for the remainder of his life.**

A.  <u>The Defendant's identity is unknown to the Government</u>

On October 18, 1980, an individual from Haiti – **not the Defendant** –  who identified himself as Rony Denis entered the United States through the Port of Miami and was assigned the Alien Number ("A-file number") *A-024-708-198*. (Doc 99 at 20-22, 26.) He provided a date of birth ("DOB") of *August 23, 1959*. (Id. at 26.)  Rony Denis was granted asylum and was given the Social Security Number ("SSN") *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*. (Id. at 20-22.) At the time of his entry into the country, Rony Denis was photographed and fingerprinted. (Id. at 27.)  He was fingerprinted a second time in 1987, when he applied for permanent residency. (Id. 27-28.) In connection with his application for permanent residency, Rony Denis underwent a medical examination and learned that he was positive for the HIV antibody. (Id. at 27-28. Rony Denis resided in Florida from the time he entered the United States until his death in 1989. (Id at 39-40.)

In July 1983, the Defendant – FNU LNU – enlisted in the Army using the biographical information of the deceased Rony Denis. (Id. at 33-37.)  FNU LNU enlisted under the name *Rony Denis* with a DOB of *August 23, 1959,* an A-file number of *A024-708-198* and the SSN *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*.  (Id.)  The Defendant provided a driver's license and his fingerprints when he entered the military in 1983. (Id. at 55.)

In 2025, the two sets of fingerprints of the deceased Rony Denis which were collected in 1980 and in 1987 were compared. (Id.) The comparison showed that two sets of prints are from the same individual – the deceased Rony Denis. (Id.)

Also in 2025, the fingerprints of the Defendant FNU LNU, which were taken upon his entry into the military in 1983 and upon his arrest in 2025 for the instant offense were compared. (Id. at 55-56.)   The comparison showed that two sets of prints are from the same individual – the Defendant. (Id. at 56.)

The prints from Rony Denis from 1980 and 1987 were compared to the prints from Defendant FNU LNU from 1983 and 2025.  The comparison shows that Rony Denis and FNU LNU are not the same person. (Id.)

Further, the Defendant was tested for the HIV antibody in 1995 and tested negative, unlike the real Rony Denis. (Id at 45.)

In 1988, the Defendant married a US Citizen and in 1995, he filed an application for naturalization using the SSN ***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***. (Id at 40.)[1]   This application was denied because he tried to be naturalized based on his military service but his service dates were too remote. (Id. at 41.)   He then reapplied for naturalization in 2001 as an alien relative (i.e. because his spouse was a citizen) (Id.

---

[1] The Defendant's application for Naturalization in 1995 was the first record of any kind that immigration had with the defendant. (Doc. 99 at 38.)  The Defendant applied for Naturalization using the SSN belonging to the deceased Rony Denis. (Id. at 40).  The Defendant did not include the A-file number of the deceased and noted N/A on his application. (Id at 42-43).  A new A-file number was assigned to the Defendant. (Id.) After the Defendant received a new A-file number after when he then also applied for new social security number (Id. at 48-49).  He received a new number in 1996. (Id.)  In spite of having a new A-file number and a new SSN, the Defendant was Naturalized under the deceased Denis' SSN and applied for a passport with the number as well. (id. at 49).  When the Department of State investigated the Defendant's use of a dead person's SSN for a passport in 2012, the Defendant renewed his passport using the SSN he "had in his back pocket" for 16 years. (Id at 53-54, 111-112, 140).

at 49.)  He again used SSN **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.**  (Id. at 49-50.)  He was granted citizenship in 2002 under this SSN and in that same year applied for a U.S. Passport using that SSN. (Id at 52-55.)  At the present, the Defendant's true identify remains unknown.

### B.  Financial Resources

The Defendant asserts in his motion that the Government failed to prove that the Defendant has the "liquidity to flee" (doc. 109 at 7) and suggests that there is no evidence of "personal funds" available to the Defendant. (Id.)  The suggestion that the Defendant does not have **access** to financial resources simply belies all of the evidence in this case.

The Defendant ignores the overarching schemes in this case, which show that the bulk of the ill-gotten funds from both the VA Education Benefits and the bank fraud scheme flowed to the Defendant to fund his lavish lifestyle.  The Defendant purposely put in place schemes in which he would remove his name from accounts, properties, and other documents to try and distance himself from the crimes. (Doc. 99 at 167.)

As the Government showed at the detention hearing, the Defendant is the shot-caller who tries to remain in the background but who benefits the most from the schemes.  The Defendant uses, among other tactics, straw purchasers, nominees, and LLCs to carry out his plans.

Between 2018 and 2020, the Defendant had unreported income to the IRS of $5,700,000 (Id. at 153-154 and Gov't Ex 7, Slide 7.)  The bank fraud scheme – of using straw purchasers to buy homes and turn them into rental properties was done to

purposely distance the Defendant from the scheme – he, however, was the one who benefitted the most.

In May of 2019, co-Defendant Anthony Oloans ("Abdullah") submitted a document to the Defendant which showed that between April 6, 2017, and April 19, 2019, over $3,753,000 was deposited into the Defendant's bank accounts at Bank of America and Wells Fargo. (Doc 99 at 160-161, and Ex 7, Slide 12-14.)

On April 11, 2018, a check written on an account of the House of Prayer Christian Church ("HOPCC"), Phebe Ruth Denis Foundation for $800,000 was used for down payments on the Defendant's home in Martinez, Georgia and one in West Palm Beach, Florida. (Doc. 99 at 155-156, Ex 7, Slides 8-9.)

At the detention hearing, the Defendant, through his lawyer, outlined his ownership (either personally or held in an LLC) of eight properties and claimed equity of over $5,000,000 (Doc. 100 at 41-45.) He also indicated ownership of an apartment complex that generated $65,000 of rent per month. (Id. at 42.) The mortgage fraud scheme involved hundreds of properties over the course of the conspiracy and rent was still being collected up to the present. (Id at 70.)

The Defendant used nominees to purchase luxury cars. For example, the Defendant's 2016 Bentley vehicle is titled in now ex-HOPCC member's name - Casonia Fryar. (Gov't Ex 7, Slide 11.) In 2025, this vehicle was registered to Casonia Fryer in Florida at the Defendant's West Palm Beach residence. (Id.)

The Defendant caused ill-gotten VA Education Benefit funds to be laundered through numerous accounts before ultimately making the car payment on this

7

Bentley vehicle. In 2020, VA Education Benefit funds were deposited into the House of Prayer Bible Seminary ("HOPBS") account. Just over $36,000 then passed through two HOPCC bank accounts in three separate transactions. The funds were passed to a third HOPCC account in three transactions. From that HOPCC account, two transfers of funds went to a fourth HOPCC account and a Centex Management account. From there funds were moved from the Centex Management account to an account belonging Defendant Joseph Fryar who then paid over $19,000 in car payments for vehicles used by the Defendant and paid for with ill-gotten gains. (Doc. 99 at 156-158, and Gov't Ex 7, slide 10.)

## C. <u>Argument</u>

In order to secure the pretrial detention of a Defendant based on serious risk of flight, the Government must show that he is in fact a rick of flight by a preponderance of the evidence. *See United States v. Quartermaine*, 913 F.2d 910, 915-17 (11th Cir.1990). The case law offers a number of factors to consider when weighing the risk of flight which includes, among other things, the use of aliases, hidden assets or access to considerable funds to finance flight from the jurisdiction. *See United States v. Giordano,* 370 F. Supp. 2d 1256 (S.D. Fla. 2005).

In the instant case, the Defendant is not just using an alias – he is living under an identity that he purloined as early as 1983, and his true identity remains a mystery still today. Further, the defendant's access to considerable assets and the potential existence of hidden assets has been shown far beyond the preponderance standard.

The Government contends that, while there are other bases for detention in this case, the fact that the Defendant's true identity is unknown is alone sufficient to show by preponderance of the evidence that he poses a serious risk of flight. The Defendant attempts to soften this fact – saying that the Defendant merely used "a pseudonym." (Doc 109 at 8.)  The reality is that the Defendant stole the identity of "Rony Denis" including his SSN, DOB, and A-file number to enlist in the military in 1983.  Nineteen years later, in 2002, the Defendant then used "Rony Denis's" SSN when he obtained U.S. Citizenship and when he obtained a U.S. Passport. And for the last 42 years, the Defendant has held himself out to be Rony Denis – who died in 1989.

Further, the Defendant is facing up to 30 years on the bank fraud conspiracy and is between 62 and 66 years old, depending on which year of birth is used to calculate his age.[2]  Any lengthy sentence could be in essence a life sentence for the Defendant.

In spite of trying to distance himself from the fraud in this case, the Defendant has, since as early as 2004, been at the helm of the fraud schemes and the financial benefit to him has been in the millions and millions of dollars.  The Defendant had access to huge amounts of money for many years from sources that don't appear to be connect to him except upon close examination.  There is no reason to think that this

---

[2] The Defendant enlisted in the military using 1959 as his year of birth.  Somehow the military changed the year of birth to 1963. However, the Government does not know the true identity of the Defendant– so either could be wrong.

Defendant presently does not have liquid and hidden assets of which the Government

is unaware.

As noted by Magistrate Judge Epps:

[I]t's undisputed that for decades this Defendant has traveled under a
false name and a false Social Security number and the record as testified
by the government's witness is, essentially, that he appeared out of the
mist when he started his military service and the concern from a risk of
flight standpoint is if you can appear out of the mist like that, you can
disappear back into it pretty easily as well, and so even now I don't think
we have concrete evidence to know who this Defendant is, and when you
look at flight risk, that's a huge red flag. The other red flag here -- in my
12 years on the bench I have not seen anyone who has the resources --
the potential resources -- to flee like he does.
We heard testimony of millions of dollars that went from these alleged
fraud schemes directly into his pocket by way of corporate entities that
were in between. We heard testimony about -- a proffer about a
bewildering network of accounts that are closed and opened in all of
these different names, but the ultimate beneficiary of those funds
flowing through all of these accounts being this Defendant which is a
hallmark of fraud, and we heard also proffers about mansions in Palm
Beach and a mansion in Augusta and Rolls Royces and Bentleys with no
discernable source of income other than the schemes alleged by the
government, and so when you put those two things together -- the false
identity and the money that we can't really track and know exactly how
much of that exists and where it is right now, he's a prime candidate for
flight. (Doc. 100 at 74-75.)

The Government contends that a Serious Risk of Flight has been established

by preponderance and that it alone is sufficient to detain the Defendant and deny the

Defendant's motion.

## II.    The Defendant is a Serious Risk of Obstruction or Attempt to Obstruct

The Defendant argues that he never "attempted to harm" any ex-HOPCC

members and that he is not a serious risk of obstructing or attempting to obstruct.

(Doc 109 at 8.)  The evidence in this case would suggest otherwise by a clear and convincing standard.

First, Ex-HOPCC members were identified as "traitors."  (Doc. 99 at164, and Ex 7, Slides 15-17.)  The Defendant maintained electronic materials that contained Personally Identifiable Information on approximately 60 people, of which he would have access to if released. (Id. at 165.)  The Defendant has a history of obstructive conduct relating to the HOPBS. On at least one occasion he ordered a now-former HOPCC member to return from South America in order to "scrub" files for a VA inspection of the bible seminary (Id. at 165-166 and Doc. 100 at 58).  When this individual left the HOPCC – the Defendant warned him "if you fight me, I will fight you back."  (Doc. 99 at 166).  Another former member described the Defendant as "a mob guy" and said when he left the organization the Defendant told him " I'm not one you can play with, be careful." (Doc. 100 at 17.)

Another former member feared harm from the Defendant if the Defendant knew she met with the Government. (Id.)  This same witness became so frightened in a meeting with the Defendant that she urinated on herself. (Id.)

After being investigated by an FBI agent named Freddie Watkins around 2007-2008, the Defendant began calling meetings on "how to stay ahead of the FBI." (Id. at 18.)

The Defendant's past not only goes to show that he is a risk of obstructing – he is not beyond using lying and violence to accomplish his goals.  While in the military the Defendant was punished pursuant to Article 15 for forging promotion papers and

11

attacking a superior female officer.  (Id at 27.)  He also pulled a knife on another soldier.  (Id.) In an incident involving several minor female children, he locked them in a room for one to two weeks and forced them to defecate and urinate on the floor. He then made them clean it up with their hands. (Id. at 29.)  The Defendant also used a belt to beat these same girls and left visible marks on their arms and legs.  (Id. at 27-29.)  The Defendant made one of these victims stand in front of the congregation and he called her a "whore" after she told him that she had been sexually assaulted. (Id. at 29.)

The Defendant ability to manipulate, control, and dominate others is – which is demonstrated by the recordings contained in Government's Exhibit 7, Slides 18-27, is another factor that shows that the Defendant is a serious risk of obstructing or attempting to do so.

The Government contends that the Serious Risk of Obstructing or Attempting to Obstruct has been established by clear and convincing evidence and the Court may order detention in that basis.

## III.    Serious Danger (§ 3142(e) and § 3142(g))

"[D]angerousness as a grounds for detention is not excluded in cases involving detention hearings brought under (f)(2). This conclusion is based on a plain reading of the statute's unambiguous language and structure, the [Bail Reform] Act's legislative history, and the *Johnson* and *Singleton* courts' analyses. This Court is convinced that Congress intended that dangerousness be considered in all instances whether arising under subsection (f)(1) or (f)(2)."

*United States v. Holmes*, 438 F. Supp. 2d 1340, 1351 (S.D. Fla. 2005),

*citing United States v. Johnson*, 399 F.3d 1297 (11th Cir. 2005) and *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999).

In the instant case, all four factors in § 3142(g) militate against the Defendant.

### A.  The Nature and Circumstances of the Allegations

The Indictment alleges, and the Government will prove, that the Defendant is the leader of the HOPCC, which was established in Hinesville, Georgia around 2004. Around that time, the Defendant began the mortgage fraud scheme which involved using straw purchasers to amass hundreds of rental properties. The Defendant and other co-defendants directed HOPCC members to live in these rental properties, in order to generate income that flowed to the Defendant and others.   This scheme resulted in financial institutions making loans they would have not otherwise made and the Defendant receiving millions of dollars from rental income.

The Defendant claims that the crimes are "temporally remote." This assertion is far from accurate.  The rental income earned by amassing properties by the use of straw purchasers has continued up to at least the return of the indictment.  The conspiracy began in 2004 and has continued for 20+ years, with the Defendant being the one who benefitted more than any other person involved.

The VA Education scheme went on for almost a decade and produced funds that allowed the Defendant to drive Bentley and Rolls Royces.  This scheme lasted into 2021.

### B.  The Weight of the Evidence

The weight of the evidence against the Defendant is overwhelming. That evidence includes, among other things,  bank records, loan documents, tax documents, recordings of the Defendant directing the actions of other co-defendants and witnesses, the testimony of dozens and dozens of ex-HOPCC members who will testify about the control that this Defendnant exercised over the members of the HOPCC, numerous witness who were directed by the Defendant to act a straw purchasers, documentation received from Ex-HOPCC member showing the inner workings of the Defendant's real estate scheme and the roles of the other co-defendants in the scheme.

### C. The History and Characteristics of the Defendant

The Defendant has been operating for at least 42 years as someone that he is not.

### D. The Dangerousness Posed to the Community by Release

See Section II above.

### IV.    Conclusion

For the foregoing reasons, the Government respectfully requests this Court to deny the Defendant's Motion to Revoke the Magistrate's Detention Order and order the Defendant detaining pending trial.

Respectfully Submitted this 7th day of November, 2025.

MARGARET E. HEAP
UNITED STATES ATTORNEY

*s/ Patricia Green Rhodes*
Patricia Green Rhodes
Assistant United States Attorney

14

Chief, Criminal Division
Georgia Bar No. 307288
P.O. Box 2017
Augusta, GA  30903
(706) 826-4534

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing on all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 7th day of November 2025.

MARGARET E. HEAP
UNITED STATES ATTORNEY

***/s/ Patricia Green Rhodes***
Patricia Green Rhodes
Assistant United States Attorney
Chief, Criminal Division
Georgia Bar No. 307288
P.O. Box 2017
Augusta, Georgia 30903
706-826-4534
patricia.rhodes@usdoj.gov
