UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION


United States of America,      )
                               )
          Plaintiff,           )
                               )
       vs.                     )      Case No. 1:25CR62
                               )
Rony Denis, Anthony Oloans,    )
Joseph Fryar, Dennis Nostrant,)
Gerard Robertson, David Reip, )
and Marcus Labat,              )
                               )
          Defendants.          )
_____)



INITIAL APPEARANCE AND ARRAIGNMENT
BEFORE THE HONORABLE BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
THURSDAY, SEPTEMBER 11, 2025; 3:03 P.M.


FOR THE PLAINTIFF:

     Patricia G. Rhodes, Esquire
     George J.C. Jacobs, III, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT BY VIDEOCONFERENCE:

     Steven H. Sadow, Esquire
     Steven H. Sadow, PC
     260 Peachtree St. NW
     Atlanta, Georgia 30303
     (404)577-1400

TRANSCRIBED FROM DIGITAL RECORDING BY:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

2

(Call to Order at 3:03 p.m.)

THE CLERK:  The court calls case 1:25CR62.  The United States of America versus Rony Dennis, Anthony Oloans, Joseph Fryar, Dennis Nostrant, Gerard Robertson, David Reip, Marcus Labat.  Steve Sadow appearing by video for Mr. Denis.  All here for initial appearance.  Patricia Rhodes for the government.

THE COURT:  Good afternoon, everybody.

MRS. RHODES:  Good afternoon.

MR. SADOW:  Good afternoon, Your Honor.

THE COURT:  All right.  So, Mr. Sadow, can you hear me okay?

MR. SADOW:  I can, Your Honor.  Thank you.

THE COURT:  All right.  The first thing I want to say to the defendants is just to, hopefully, put you at a little ease today.  Today we're not doing much in your case.  What we're going to do is make sure that you understand why you're here -- right? -- the nature of the charges against you, the maximum penalties associated with those charges.  I am going to make sure you understand some of your basic rights, your right to legal representation, your right to remain silent.

We'll talk about whether the government is asking for any of you to be detained pending trial and for the ones for which the government is not asking that you be detained, you will be released on bond and we'll talk about what the conditions are, what we'll expect of you while you're on bond

pending trial.

I'll ask about your citizenship because if you have citizenship in another country, there are some additional rights I'll need to explain to you.  So that's really the sum and substance of what we're going to do here today.

We are not going to take any kind of plea from anybody here today.  Once everyone has a lawyer who's admitted to this court appearing with you very shortly, hopefully, after today we'll bring you back.  We'll enter a not guilty plea for all of you and then we'll receive from the government all the information that you're entitled to receive as you prepare for trial in this matter and we'll set a schedule at that point that gets us through the pretrial phase of this case.  We're not going to do any of that today, though, because we don't have anyone who is ready for that part of the process.  So, really, just information primarily for y'all to understand about your case.

Before we do those things, the very first thing I must do is make sure that each defendant is competent.  So I am going to start on the front row with Mr. Denis and I'll ask questions of each defendant on the front row and then we'll go to the back row and do the same.  So I would ask that you listen to the question that I ask Mr. Denis and be prepared to answer it when I get to you.

Mr. Denis, in the past three to four months have you

been seen by any type of medical practitioner including any physician, psychologist or psychiatrist?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans, what about you?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  How do I pronounce your name?

DEFENDANT NOSTRANT:  Nostrant, sir.

THE COURT:  Nostrant.  I'll do the best I can to remember that.

What about you, Mr. Robertson?

DEFENDANT ROBERTSON:  No, sir.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  No, sir.

THE COURT:  Is that how you pronounce your name?

DEFENDANT REIP:  Yes, sir.

THE COURT:  Okay.  And Mr. Labat?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  And did I pronounce that correctly?

DEFENDANT LABAT:  You did, sir.

THE COURT:  Okay.  All right.  The next question:  In that same timeframe -- the last three to four months -- have

you undergone any type of counseling or therapy, Mr. Denis?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  No, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  No, Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  In your lifetime, Mr. Denis, have you ever been diagnosed with any type of mental health condition or mental illness?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  No, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  No, Your Honor.

THE COURT:  Mr. Labat?

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT:  Tell me when you were diagnosed and what condition that was.

DEFENDANT LABAT:  2021, Post-Traumatic Stress condition.

THE COURT:  Is that the only condition that you've ever been diagnosed with in terms of your mental health?

DEFENDANT LABAT:  And anxiety.

THE COURT:  Anxiety.  Okay.

THE CLERK:  We're going to hand them the microphone.

THE COURT:  Okay.  That's fine.  Since you're so far away, we've got to make sure that what you say is being picked up --

DEFENDANT LABAT:  Gotcha.

THE COURT:  -- and it's being recorded, but, you know, the record -- let it reflect that he answered affirmatively he does have a mental health diagnosis of anxiety and PTSD in 2021, I think you said?

DEFENDANT LABAT:  Yes, sir.

THE COURT:  Okay.  Let's talk about the last two or three weeks.  Have you had any symptoms of those conditions?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  You've been fine.  Are you taking any medications for those conditions?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  All right.  Thank you for that.

All right.  Then, Mr. Denis, are you currently prescribed any medications?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  What are you prescribed?

DEFENDANT ROBERTSON:  Rosa-Pan.

THE COURT:  What is that for?

DEFENDANT ROBERTSON:  High blood pressure.

THE COURT:  Anything else?

DEFENDANT ROBERTSON:  And Terazosin.

THE COURT:  What is that for?

DEFENDANT ROBERTSON:  Enlarged prostrate, Your Honor.

THE COURT:  Is that it?

DEFENDANT ROBERTSON:  That's it.

THE COURT:  Okay.  Thank you.

Mr. Reip?

DEFENDANT REIP:  Yes, Your Honor.  High blood pressure medicine, lisinopril.

THE COURT:  Is that it?

DEFENDANT REIP:  Yes, sir.

THE COURT:  Okay.  And Mr. Labat?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  All right.  In the past 24 hours have you had any alcohol, medicines or drugs of any kind, Mr. Denis?

DEFENDANT DENIS:  No, Your Honor, but let me say the question about the prescribed, I didn't quite understand it.  I do have glaucoma and I have been prescribed a medication for glaucoma.

THE COURT:  All right.

DEFENDANT DENIS:  So I was more thinking of something cancer-like, but, yes, I have glaucoma.

THE COURT:  Okay.  Well, it wasn't a question about cancer.  It was a question that's much broader.  Are you currently prescribed any medication --

DEFENDANT DENIS:  Yes, sir.

THE COURT:  -- other than the one you just identified?

DEFENDANT DENIS:  The -- for glaucoma.  That's it.

THE COURT:  That's it.  Okay.  All right.  Aside from

the medication for glaucoma that you take under prescription, have you had any alcohol, medicine or drugs of any kind in the past 24 hours?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  No, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  No, Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  All right.  Based on your answers to my questions I find that each of you is competent.  Of course, we just had a very quick conversation where you've answered some very simple questions.  You're going to have an attorney by your side the next time I see you so I'll also inquire about their opinion about your competency, but based on what you've said today and your general appearance, I don't have any doubts that each of you is competent.

All right.  The next thing we're going to do is talk

about some of your very basic rights.  The first of those is your right to legal representation.  You have the right to be represented by an attorney at every stage of this case, both in and out of court and including any questioning by law enforcement.  You have the right to consult with an attorney before questioning may occur at any time.  You may hire your own attorney if you're financially able to do so, and if you're unable to afford an attorney, I'll appoint one to represent you at no cost to you.

Mr. Denis, do you understand your right to legal representation?

DEFENDANT DENIS:  Yes, Your Honor.

THE COURT:  And Mr. Oloans?

DEFENDANT OLOANS:  Yes, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  Yes, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  Yes, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  Yes Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT:  All right.  Mr. Denis, are you seeking

court-appointed counsel or are you going to retain an attorney with your own funds?

DEFENDANT DENIS:  My own attorney, Steve Sadow.

THE COURT:  Okay.  And, Mr. Sadow, I appreciate you being here today.  I inquired of the Clerk's Office before this proceeding ---

MR. SADOW:  Judge, you just froze.

THE COURT:  All right.  Am I still frozen?

MR. SADOW:  Nope.  You're good now.  Thank you, sir.

THE COURT:  Okay.  All right.  I inquired of the Clerk's Office before we began this proceeding and we don't have any record of you being a member of this court.  I know you made an entry of appearance, but you'll, obviously, need to either gain admission by membership or through the pro hac vice process.  All right?

MR. SADOW:  I understand, Your Honor.  I expect David Stewart will be my local counsel.

THE COURT:  Okay.  And so I would have -- had you been a member or pro hac'ed in already, I would have gone through the arraignment process and gotten the discovery rolling and all that and allowed you to participate today, but we're pretty strict on those things here.  I appreciate you being here, but we're not going to involve you in the process.  Is that okay?

MR. SADOW:  It is.  I do have a request that I wanted to make, but I'll let the Court decide whether you'll hear from

me after you go through whatever you're doing with Mr. Denis.

THE COURT: Okay. What's the nature of the request?

MR. SADOW: As the Court can tell from the Indictment the identity of Mr. Denis is an issue and it is likely to be the issue that we address at a detention hearing. I was hoping to convince the Court to ask or permit early disclosure of whatever information the government intends to use on identity at the detention hearing.

THE COURT: Okay. Well, I think, you know, I'm pretty constrained right now to hear from you and so I appreciate you putting that in front of me so I have advanced notice of it, but I am not going to take any action on that today since you're not -- since you're not a member of the court yet.

MR. SADOW: I understand, and, if I might, when I bring in Mr. Stewart which, hopefully, will be either tomorrow or Monday I will in some form or fashion attempt to make the same request --

THE COURT: Okay. All right.

MR. SADOW: -- assuming the court allows me to proceed pro hac vice.

THE COURT: Okay. All right. Thank you for that.

All right. Mr. Oloans, are you going to retain counsel or are you seeking court-appointed counsel?

DEFENDANT OLOANS: Retain counsel, Your Honor.

THE COURT: Okay. And have you started making

inquiries in that regard?

DEFENDANT OLOANS:  Yes, Your Honor.

THE COURT:  Okay.  Because, you know, for each of you who intends to hire your own attorney but you haven't completed that process yet, it is very important that you not make -- have any delay.  We need you to work on that now and I would like to see y'all back for an arraignment with an attorney by your side next week -- the earlier the better next week so we can get your case rolling.

All right.  Mr. Fryar, what about you?

DEFENDANT FRYAR:  I am going to retain counsel, Your Honor.

THE COURT:  All right.  Mr. Nostrant?

DEFENDANT NOSTRANT:  I am going to retain counsel, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  I am going to retain counsel, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  I am going to retain counsel.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  I am going to retain counsel as well, Your Honor.

THE COURT:  Okay.  So I don't know anything about your finances right now, but it may be that you go out there and you

start asking around what it would cost to hire someone and you come to a decision that even though you think you can retain someone that truly you cannot afford someone.  If you get to that point then all you need to do is notify your probation officer of that fact or my Courtroom Deputy, Courtnay Capps, and we'll have a one-page financial affidavit that you'll need to complete that I'll need to review to determine whether you need court-appointed counsel, and if I find that you qualify, then I'll appoint an attorney to represent you at no cost to you, but, like I said, I do need you to go ahead and start that process with all due haste so your case doesn't languish.

All right.  The next thing I need to talk to you about is your right to remain silent.  You have the absolute constitutional right to remain silent which means no one associated with the government or any law enforcement agency can force or compel you to make any statement regarding any subject whatsoever including the allegations that you face in this case.  You certainly have a right to remain silent with respect to this case.

Your right to remain silent is not limited to this case.  Instead, your right to remain silent includes any topic, any statement made by you or the answers you give to any questions asked of you can be used as evidence against you not only in connection with this case but also any other case that's currently pending against you or may be brought against

you in the future in any court in any jurisdiction.  The bottom line is you're not required to make a statement.  If you have made a statement, you need not say any more, and if you start to make a statement, you may stop at any time.

Mr. Denis, do you understand your right to remain silent?

DEFENDANT DENIS:  Yes, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  Forgive me, Your Honor.  My right ear is a little clogged up.  I couldn't quite hear the question.

THE COURT:  Do you understand your right to remain silent?

DEFENDANT OLOANS:  Yes, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  Yes, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  Yes, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  Yes, Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT:  All right.  Now we're going to move to the

16

Indictment and the first thing I want to make sure is that everybody has a copy of it.

THE COURT: Mr. Denis, did you receive a copy of the Indictment?

DEFENDANT DENIS: Yes, Your Honor.

THE COURT: And the penalty certification that goes along with it?

DEFENDANT DENIS: I'm sorry?

THE COURT: The penalty certification that goes along with it?

DEFENDANT DENIS: Yes, Your Honor.

THE COURT: And Mr. Oloans?

DEFENDANT OLOANS: Yes, Your Honor.

THE COURT: Mr. Fryar?

DEFENDANT FRYAR: Yes, Your Honor.

THE COURT: Mr. Nostrant?

DEFENDANT NOSTRANT: Yes, Your Honor.

THE COURT: Mr. Robertson?

DEFENDANT ROBERTSON: Yes, Your Honor.

THE COURT: Mr. Reip?

DEFENDANT REIP: Yes, Your Honor.

THE COURT: And Mr. Labat?

DEFENDANT LABAT: Yes, Your Honor.

THE COURT: All right. Now I am going to turn to the prosecutor.

Mrs. Rhodes, if you could please summarize those

documents.

MRS. RHODES:  Your Honor, I beg the Court's indulgence.  It may take a minute to summarize this.

THE COURT:  Okay.

MRS. RHODES:  It is a very lengthy Indictment.

THE COURT:  Sure.

MRS. RHODES:  I would be better standing at the podium, if you don't mind.  Your Honor, the grand jury has returned the Indictment for various charges against each of the defendants.  In summary the Indictment charges as follows:  In the introductory allegations that is paragraphs one through three it alleges that the first defendant in the caption is a person whose true identity is unknown.  His listed name is FNU LNU also known as Rony Denis and has been using that stolen identity of another Rony Denis since at least 1983.

Paragraphs four through 11 describe very generally each of the defendants, where they have lived, and a general description of their role in the House of Prayer Christian Churches which is an organization that is at the hub of this Indictment.  Paragraphs 12 through 17 describe the establishment of the House of Prayer and the associated Bible seminaries.  Paragraphs 18 and 19 describe the disbursement of funds to the defendants from church and seminary bank accounts. Paragraphs 20 through 31 describe the control, manipulation -- and manipulation exercised by the defendants over members of

the congregation which includes, but is not limited to, the defendants directed people in the House of Prayer to attend the Bible seminaries.

The defendants -- particularly, Mr. Oloans and Mr. Denis -- maintain House of Prayer members' personally identifiable information including driver's license and social security numbers that were used in connection with the fraud. At the seminary some of the members were required to sign nondisclosure agreements.

Mr. Denis arranged marriages and orchestrated divorces among House of member -- House of Prayer members.  Excuse me. House of Prayer members were directed by the leaders, including Denis, to live in certain houses and even live in certain cities.  Members were required to attend some kind of meeting or gathering with the organization seven days a week or provide an excuse as to why they were absent.

Military members were heavily recruited.  Members were required to report other members who broke rules of conduct of the church including such infractions as wearing worldly or unbecoming attire.  The seminary students were counseled in writing for infractions and members were expected to cut off communications from those who left the organization including family members and they were deemed traitors at the point of leaving.

This brings us to Count One in the Indictment:  The

Conspiracy to Commit Bank Fraud.  Incorporating some of the previous paragraphs, the Indictment alleges that beginning on a date unknown to the grand jury but as early as 2004 and continuing through the date of this Indictment, the exact dates being unknown, in the Southern District of Georgia and elsewhere, that FNU LNU (First Name Unknown, Last Name Unknown) also known as Rony Denis, Anthony Oloans, Joseph Fryar, Denis Nostrant, Gerard Robertson, and David Reip and other conspirators known and unknown to the grand jury, did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the grand jury to commit bank fraud; that is, to knowingly execute and attempt to execute the below scheme which I'll describe in a moment and artifice to defraud and to obtain money, funds, assets, securities, and other properties owned by and under the custody and control of financial institutions as defined by federal law by means of materially false and fraudulent pretenses, representations, and promises.

The object of the conspiracy was for the defendants to unlawfully enrich themselves.  The manner and means included but -- included, but were not limited to, the following:  Denis and Oloans would direct members of the House of Prayer to act as straw buyers in residential real estate transactions.  These transactions were not arm's length transactions and involved Denis, Oloans, Fryar, Nostrant, Robertson, and Reip as buyers,

sellers, notaries or powers of attorneys in these transactions.

The straw buyers would be required to execute loan documents which the defendants knew contained false information and to obtain mortgages from financial institutions for these purchased properties. After the closings the defendants would seize control over them and convert them into rental properties. The defendants would then direct other members of the House of Prayer to live in the properties and would collect rent. The mortgages obtained in the names of the straw buyers would be paid using bank accounts in the names of LLCs which were controlled by Oloans, Nostrant, Reip, and sometimes a combination of these defendants.

Oloans would create powers of attorney which would be used by the defendants to buy, sell, and transfer properties that had been purchased using the straw buyers and sometimes these powers of attorney were maintained for years for future use. Oloans, Nostrant, Fryar, Reip and Robertson would also create fraudulent powers of attorneys by forging signatures and then falsely notarizing the same and would use them to buy, sell, and transfer properties.

The defendants would establish Limited Liability Corporations or LLCs after which they would transfer properties into them using the powers of attorney and quitclaim deeds. Some of the transfers were unknown to and unauthorized by the mortgage lender. Members or registered agents of the LLCs used

for this purpose included Oloans, Nostrant, and Fryar.

At times after the initial mortgage loan, Oloans would impersonate straw buyers to induce lenders to grant loan modifications or forbearance.  In some instances the defendants allowed mortgages held in the names of straw buyers to go into default and foreclosure thereby harming the straw buyer's credit.  Between 2001 and 2020 the defendants collected rent payments totaling over $5.2 million.  These payments were deposited primarily into accounts for Governor's Management, LLC and the Prudential Realty, LLC which were Fryar and Oloans -- of which Fryar and Oloans were members.

The rental income was used to advance the object of the conspiracy including, but not limited to, at times paying mortgages on some of the other rental properties, at times paying mortgages on Denis' homes in West Palm Beach, Florida and Martinez, Georgia, and at times paying credit card bills for the defendants.

There are five examples detailed in the Indictment of how this scheme was executed and I want to summarize them at this time, Your Honor.  The first example of the straw purchase of 808 Spanish Oak Drive in Hinesville, Georgia.  On June 6 of 2008 House of Prayer members whose initials are AS purchased Spanish Oak Drive in Hinesville, Georgia for $86,000.  Two months later AS sold that property to a straw buyer who was then a member of House of Prayer for $115,000.  The straw buyer

had been instructed by Denis to attend the closing as the buyer.  AS was not present at the closing and had another House of member -- Prayer -- act as his power of attorney for the closing.  The straw buyer was not employed, did not earn an income, brought no funds for the down payment, never lived in the property, never paid the mortgage, never collected rent or any rental income from the property.  After the straw buyer left the House of Prayer, Oloans transferred ownership of 808 Spanish Oak to Syntex Management of which he is a member.

The straw purchase of 1374 Forest Lake Drive in Hinesville, Georgia is the second example.  On March 28 of 2008 Oloans purchased 1374 Forest Lake Drive in Hinesville for $56,500.  On August 4, 2008, a uniformed residential loan application was completed over the phone for that purchase of that property.  The straw buyer did not complete that application.  The application falsely represented that a straw buyer had a monthly income of approximately $4,400 a month.  However, the straw buyer did not work and had no income.

Oloans directed the straw to appear on August 22, 2008, at an attorney's office to act as the straw on this purchase.  Oloans was the seller and the sale price was $105,000.  The straw buyer never lived at 1374 Forest Lake Drive, never paid the mortgage, never collected or received any rental income.  A week after this straw buyer left the House of Prayer, a Quitclaim Deed was filed transferring this property

to Syntex Management of which Oloans, the original seller, was a member.  The lending institution still had the straw buyer listed as the party responsible for the loan, and on June -- I'm sorry -- January 2 of 2018 the financial institution foreclosed on that property in the name of the straw buyer rather than on Syntex Management.

The straw purchase of 707 Madison Drive in Hinesville, Georgia.  On November 10 of 2005 Denis purchased 707 Madison Drive for $82,000.  Three months later Denis with Oloans acting as his power of attorney sold it for $122,000.  The sale contract listed the name of a then member House of Prayer as the buyer who was completely unaware of the transaction.  At the closing Reip using a forged power of attorney of this purported straw buyer signed a loan document for the purchase. The straw buyer never lived in the property, never paid the mortgage, and never collected or received any rental income.

The straw purchase of 801 Krebs Lane in Hinesville. On November 11, 2013, Fryar purchased 801 Krebs Lane for $30,000.  A month later a sales contract for that property was executed which showed the buyer to be then House of member -- a member of the House of Prayer at the time.  This purported buyer did not enter that contract.  The sales price was $103,000.  On January 29 of 2014 Oloans directed this straw buyer to travel from his home in California to the Southern District of Georgia for the purpose of attending the real

estate closing.

The next day Oloans accompanied the straw buyer to the real estate closing.  Fryar was present as the seller.  Prior to the closing someone other than the straw buyer submitted a fraudulent loan application to Wells Fargo.  The defendant submitted a loan packet -- excuse me.  The defendants submitted in the loan packet a forged and bogus gift letter which claimed that the straw buyer and the straw buyer for 808 Spanish Oak were brother and sister and that the sister had given the straw money for the down payment.  None of this was true.

Further, the gift letter identified the straw buyer's phone number as 843-473-0743 which was actually used by Anthony Oloans.  The mailing address provided to Wells Fargo for the correspondence on that loan was PO Box 515, Allenhurst, Georgia which was opened by Joseph Fryar in 2011.  The straw buyer never lived in Krebs Lane, never paid the mortgage, and never collected any rental income.

And, lastly, the straw purchase of 1480 Flo Zechman Drive in Hinesville, Georgia.  On April 17, 2014, Joseph Fryar purchased 1480 Flo Zechman in Hinesville, Georgia for $50,000.  Two months later Fryar sold it to a House of Prayer member -- excuse me -- to House of Prayer members for $110,000.  In the mortgage loan application the buyer's phone number is identified as 843-473-0743 which is used by Oloans.  The mailing address for the straw buyer was updated at a point to

Post Office Box 465, Walthourville, Georgia which was opened by Reip in the name of Prudential Realty.

On January 15, 2021, the buyers transferred Flo Zechman by quitclaim deed to Deerwood Point, LLC whose principal is identified as Oloans.  Liberty County property records indicate that no money was transferred in that transaction.  At the time the mortgage on Flo Zechman was paid using funds from Governor's Management, LLC whose signatories are Reip and Nostrant.  Denis and Oloans controlled the rental business of 1480 Flo Zechman.

Counts two and three of the Indictment alleged substantive counts of bank fraud.  These counts are related to the straw purchase of 801 Krebs Lane which was just described. The allegations for these counts are -- the allegations for counts two and three are identical except for the date of the loan modification which forms the basis of the bank fraud.

Each count alleges that beginning in or about December of 2013 and continuing until about October 18, 2021, in the Southern District of Georgia, that Anthony Oloans, Joseph Fryar, Denis Nostrant, and David Reip, aided and abetted by each other and others known and unknown to the grand jury, did knowingly execute a scheme and artifice to defraud and obtain money, property under the custody and control of Wells Fargo, a financial institution, the deposits which were then insured by the Federal Deposit Insurance Company by means of false and

fraudulent pretenses, representations, and promises relating to a material fact.

The execution of the scheme was described in paragraphs 86 and 106 of the Indictment and are incorporated herein. More specifically, prior to October 4, 2017, Wells Fargo received a written request to allow Oloans to act on behalf of the straw buyer with respect to the mortgage on that property and did not send -- the straw did not send the correspondence and was not aware of it. On October 4 Wells Fargo responded to this request with a letter addressed to the straw buyer at Post Office Box 515 in Allenhurst, Georgia which was opened by Mr. Fryar, the seller of Krebs Lane. Wells Fargo indicated that Oloans had been added to the mortgage and was authorized to receive information and make limited updates but requested other permissions if wanted to do more.

On or about November 9, 2017, Wells Fargo notified the straw purchaser by mail at PO Box 515 that the mortgage payments were delinquent. The defendants began the process of loan modification. Count Two alleges that on or about March 30 of 2018 Wells Fargo granted that modification based on the purported financial hardship of the straw buyer when in truth and in fact the straw buyer did not request such modification.

Count Three alleges that on or about September 17, 2019, Wells Fargo granted a modification based on purported financial hardship of the straw buyer when in truth and in fact

he did not request such modification.

Count Four of the Indictment alleges a Conspiracy to Commit Wire Fraud.  Paragraphs 131 and 137 describe the entities involved in the payment of VA education benefits in the state of Georgia and various chapters under which federal law allows for those kinds of payments.  Paragraphs 138 to 142 allege that the House of Prayer Bible Seminary was, in fact, paid federal education benefits under these chapters and the Indictment generally describes the mechanism of what triggers payments of those benefits.  Paragraphs 143 through 149 describe the steps that the Bible seminaries had to follow to be able to apply to receive these education benefits in the state of Georgia.  The Indictment then describes the electronic platform that was used to seek payment from the VA and the bank accounts into which the VA education benefits were deposited.

The Indictment alleges that beginning on a date unknown to the grand jury but not later than December 27 of 2011 and continuing through on or about January 17 of 2022, in the Southern District of Georgia, that the defendants FNU LNU, aka Rony Denis, Omar Garcia, Marcus Labat, and Gerard Robertson did knowingly, willfully, combine, conspire, confederate, and agree with others known and unknown to the grand jury and with the intent to defraud devise and intend to devise a scheme and artifice to defraud the VA and various veterans and to obtain money and property from the VA and various veterans by means of

materially false and fraudulent pretenses, representations, and promises knowing that those pretenses, representations, and promises were false and fraudulently made and did knowingly transmit and cause to be transmitted in interstate commerce by means of wire certain wiring signs, signals, pictures, and signs for the purpose of execute and attempting to execute the scheme and artifice.  The object of the conspiracy was for the defendants to unlawfully enrich themselves by defrauding the VA, veterans, and receiving VA funds to which they were not entitled.

The manner and means included, but were not limited to, the following:  Denis and other members of the conspiracy directed veterans who were members of the House of Prayer Christian Church to attend the Bible seminaries.  The Bible seminaries would often exhaust veteran students' education benefits.  The veteran students would rarely, if ever, graduate from a course of study.  Starting at paragraph 162 of the Indictment it further alleges that on or about December 27, 2011, Robertson then President and Director of the House of Prayer Bible Seminaries applied to the Georgia Nonpublic Postsecondary Education Commission, also known as the GNPEC, for a religious exemption on behalf of the House of Prayer Bible Seminaries.

On January 10, 2012, the GNPEC approved the religious exception for the Bible Seminary and provided a letter to

Robertson as proof of the exemption.  The letter specifically directed Robertson and the House of Prayer Bible Seminary that they would be expected to certify annually that the House of Prayer Bible Seminaries continue to meet all the requirements making it eligible for the religious exemption which included that they did not receive any federal funds.

On or about February 29, 2012, House of Prayer Registrar Garcia submitted an application for approval to receive VA education benefits to the Georgia Department of Veteran Services.  On the same day Robertson submitted to the GDVS a graduation list from the House of Prayer for the years 2009, '10, and '11 which was, in part, false.  On or about October 2, 2012, Georgia Department of Veteran Services approved the House of Prayer Bible Seminaries to receive VA education benefits based in part on the House of Prayer meeting the requirement for the religious exemption as determined by the GNPEC.

One of the requirements pursuant to law is that the House of Prayer was not receiving any federal funds which included VA education benefits.  Once House of Prayer received the religious exemption from GNPEC and used that to receive authority to request VA education benefits, the Georgia Department of Veteran Services required House of Prayer to designate one or more persons to act as a school certifying official responsible for completing the VA Form 22-1999 which

was the form used to trigger a payment from the VA.

In 2013 the House of Prayer Bible Seminary submitted to the Georgia Department of Veteran Services its first Form 22-1999 requesting payment for federal education benefits from Georgia Department of Veteran Services.  Beginning on or about January of 2013 federal funds in the form of VA education benefits were deposited into accounts under the ownership and control of House of Prayer Christian Churches and House of Prayer Bible Seminaries.  The receipt of these federal education benefit funds rendered House of Prayer Bible Seminary ineligible for the religious exemption that had been granted by GNPEC, and, consequently, House of Prayer became ineligible to receive VA education benefits as a result of not being religiously exempted in January of 2013.

Beginning in 2015 through 2021 Defendant Garcia falsely certified to the GNPEC that the House of Prayer had not received any federal funds in each of the calendar years between 2015 and 2021 when, in fact, in each year the House of Prayer received VA education benefits exceeding $3.2 million. Further, if the VA had been aware of the fraudulent certifications relating to the Georgia facilities in Hinesville and Hephzibah, it would not have authorized operations in the remaining three seminaries in three other states.

Accordingly, the defendants defrauded the VA into paying education benefits both directly and -- directly to

HOPS, House of Prayer Bible Seminaries, in Georgia, North Carolina, Texas, and Washington for housing fees, books, and tuition payments to veterans which would not have been paid. Between in or about 2013 and 2022 the VA was defrauded into paying federal education benefits exceeding $23 million.

Counts five through 23 are specific instances of wire fraud or the substantive charges relating to that conspiracy on or about the dates listed in the table on pages 33 and 34 of the Indictment in the Southern District of Georgia for the purpose of executing the scheme which was just described, an artifice to defraud described in count four of the Indictment the Defendants Labat and Garcia, aided and abetted by each other and others known and unknown, knowingly transmitted and caused to be transmitted in interstate commerce by means of wire communications certain signs, signals, and sounds, each transmittal constituting a separate count of the Indictment.

The chart outlines that each of the specific dates a unique 22-1999 form relating to a specific veteran which was sent by either Labat or Garcia to the VA via electronic submission to a server in Pennsylvania for a request for reimbursement for VA education benefits to which they were not entitled, and, finally, counts 24 through 26 of the Indictment charges the Defendant FNU LNU aka Rony Denis with aiding and assisting in the filing of false tax returns.

Specifically, Count 24 alleges that on or about

October 15, 2019, in the Southern District, that the defendant willfully aided and assisted in the procurement -- and procured, counseled and advised on the preparation and presentation to the Internal Revenue Service of a joint U.S. Individual Income Tax Return Form 1040 for FNU LNU aka Denis and his spouse for calendar year 2018 which was false, fraudulent as to a material matter including, but not limited to, line six stating a total income of $165,601 whereas the defendant then and there well knew and believed that those items as reported were false.

Count 25 is a similar charge to the one I just described. The materiality in that one is on October 21 of -- excuse me. I think I skipped one. Okay. I'm sorry. Okay.

Pardon me, Your Honor.

Count 25 alleges that on or about October 21, 2020, in the Southern District, that the Defendant Denis willfully aided and assisted and procured, counseled and advised on the preparation and presentation to the IRS of a joint U.S. Individual Income Tax Form 1040 for the year -- for the calendar year of 2019 which was false and fraudulent as to material matters including, but not limited to, line 7B stating a total income of $155,408 whereas the defendant then and there well knew and believed that those items as reported were false and count 26, a similar tax charge that on September 15, 2021, the defendant willfully aided and assisted and procured,

counseled and advised on the preparation and presentation to the IRS a joint U.S. Individual Income Tax Form 1040.  The defendant -- for the calendar year of 2020 which was false and fraudulent as to material matters including, but not limited to, line 9 stating a total of $247,433 whereas the defendant then and there well knew and believed that those items as reported were false.

There is a forfeiture allegation or a forfeiture notice to the defendants in the event of conviction on at least some of the crimes that the government will seek forfeiture of all ill gotten gains or seek substitute assets of those.

Your Honor, the maximum penalties associated with the charges in the Indictment are as follows:  Conspiracy to commit bank fraud and bank fraud carry -- the maximum penalties are not more than 30 years of imprisonment, not more than a million dollar fine, not more than five years of supervised release, a $100 special assessment on each count, restitution, and forfeiture.

For the conspiracy to commit wire fraud and wire fraud the maximum penalties associated with those charges are not more than 20 years of imprisonment, not more than a $250,000 fine, not more than three years of supervised release, a $100 special assessment as to each count, restitution, and forfeiture.

And, finally, Counts 24 through 26, aiding and

34

assisting in filing a false tax return, the maximum penalty is not more than three years of imprisonment, not more than a $250,000 fine, not more than one year of supervised release, and a $100 special assessment, restitution, and the cost of prosecution.

THE COURT:  Thank you, Mrs. Rhodes.

Mr. Denis, is it fair to say you understand the nature of the charges and the maximum penalties associated with those charges?

DEFENDANT DENIS:  I'm sorry, Your Honor?

THE COURT:  Is it fair to say you understand the nature of these charges and the maximum penalties?

DEFENDANT DENIS:  Yes, I do, Your Honor.

THE COURT:  All right.  Mr. Oloans?

DEFENDANT OLOANS:  Yes, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  Yes, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  Yes, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  Yes, Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT: All right. Normally, at this time we would go through the process if you had your lawyers with you of accepting a plea of not guilty and then having ---

MR. SADOW: Excuse me, Your Honor. I don't mean to interrupt.

THE COURT: Yes, Mr. Sadow?

MR. SADOW: While you were proceeding with the reading of the summary of the Indictment I had my assistant contact the Clerk's Office for the Southern District. They say I'm admitted.

THE COURT: Okay. All right. Well, yeah, I inquired earlier so if I am wrong in that regard, my sincere apologies to you and ---

MR. SADOW: That's all right. I am just -- I thought I was from a past case, but, again, I want to do what the Court directs.

THE COURT: Sure.

MR. SADOW: I just wanted to inform you that we checked again and at least we're being told that over the telephone.

THE COURT: Okay. Well, that's -- I think what we'll do then is just err on the side -- I mean, we all know you're going to get admitted if you're not and I would rather -- since there is ambiguity here, I would rather err on the side of protecting your client by allowing you to participate with that

information that you've received from our Clerk's Office.  So my apologies if there was a mistake on our end in that regard and, you know, your office and mine will clear this up pretty quickly after today.

MR. SADOW:  Of course.

THE COURT:  And that's very timely information because what we can do is go ahead and proceed with your client today if you'd like to do that.  After consultation with your client, is it his wish to waive a formal reading of the Indictment and enter a plea of not guilty, Mr. Sadow?

MR. SADOW:  Yes, Your Honor.

THE COURT:  All right.  Let the record so reflect. And now I am going to ask the rest of the defendants -- we're not going to have you plead anything today, but I just want to make sure you understand the nature of the charges and the maximum penalties.  I may have already gotten through that section.

Mr. Labat, did I ask you that?

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT:  Okay.  We've already covered that.  So at this time then let's turn at least for Mr. Sadow's client, Mr. Denis, to talk about the discovery policy of the government and the status of providing discovery to defense counsel.

MRS. RHODES:  Your Honor, the discovery in this case is very voluminous and it is going to require each ---

THE COURT:  Can you pull that -- we can hear you better from the lectern so you can either approach that or pull that microphone a little closer to you.

MRS. RHODES:  I'll just stand up here.

THE COURT:  Okay.

MRS. RHODES:  The discovery in this case is going to require each defense lawyer to provide us with a 10-terabyte external hard drive.  It is going to take some time for us to turn it around.  Let me kind of back up and say we will be following our traditional expanded discovery policy in this case and so in that regard there is a lot of evidence or a lot of discovery to turn over.

One of the things that is probably the most -- the largest part of the discovery that requires this size of a hard drive is there are approximately 125 electronic devices that have been downloaded.  In order for us to provide that to defense counsel in an unzipped manner which is much easier to maneuver through, it is going to take us some time to copy it because sometimes when we begin to copy these things they start and they run into errors and you have to start them over and just the virtual size of it is going to be several days for each device or, you know, each hard drive to make a copy times eight.  So I just want to put that out there.

I understand Mr. Sadow's request for certain information and it may be that I can provide parts of that

information to him via USAfx or some other way, but all of the discovery is not going to be available, I would suggest, for probably 30 days once we get the hard drives.

THE COURT:  Okay.

MRS. RHODES:  We will work on them in the order we get them.  We will start on the ones we get and so we will turn it around just as soon as we can.  The discovery materials include among other things interview recordings of dozens and dozens of witnesses and in some cases transcripts of those interviews, summary of other witness interviews, grand jury transcripts, dozens and dozens and dozens of bank records and records from financial institutions, search warrant documents and all the related photographs, the materials collected from the search warrant including the physical documents and the electronic materials I just described.  The electronic materials as I stated are going to be sent to the defense lawyers on their hard drives.

The physical files will be available for review at the U.S. Attorney's Office.  It is approximately 80 boxes of materials, most of which are student records from the seminaries.  There are also going to be property records from several of the clerk's offices in the state of Georgia relating to over 200 properties.  The latest grand jury transcript has not been completed, but when it is, it will be transmitted expeditiously.

This is at this point all of the known discoverable material generated by any state and/or federal law enforcement agency in this case and should satisfy Rule 16, the local rules, DOJ policy, federal discovery statutes, and any relevant Supreme Court precedent including *Brady*, *Giglio*, *Jencks* and their progeny.  We are aware of our continuing discovery obligation and we'll transmit such when it is received.  This should satisfy all of our discovery obligations in this case.  It -- does the Court want my position on expert witness notice?

THE COURT:  Sure, yeah.

MRS. RHODES:  Judge, we would ask -- I don't think there are going to be many expert witness notices except maybe a fingerprint examiner and we would request 90 days.  I make that sort of long request because I do think that the defense lawyers will be asking for sufficient time to get through the voluminous materials in the case, but I can adjust that if it needs to be adjusted to a shorter time.

THE COURT:  Okay.

MRS. RHODES:  Thank you.

THE COURT:  All right.  Pursuant to Rule 5(f) I order the government to disclose all exculpatory evidence that favors the defendant or casts doubt on the government's case as required by *Brady versus Maryland* including all evidence that negates the defense' alleged guilt, negates the credibility of a witness or reduces a potential sentence.  The defendant is

40

entitled to this information without a request and failure to disclose it in a timely manner may result in consequences such as, for example, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action or sanctions.

Mr. Sadow, based on what you know about the case so far what do you think a reasonable deadline would be for pretrial motions to be filed by all parties as well as any defense expert disclosures based on the government's estimation that it'll take up to 30 days for everybody to get their hard drives back and they have requested this 90 days for their expert disclosures.

MR. SADOW:  It seems to me, Your Honor, that motions could not possibly be done with a review of the discovery for at least four or five, maybe even six months.

THE COURT:  Okay.

MR. SADOW:  Again, it's hard to say.  Ten terabytes is a great deal of information so I kind of leave that to the Court's discretion.  Maybe you should set a time four months out, five months out, and then if we need more time we can ask the Court or you could potentially declare the case complex at this point.

THE COURT:  Okay.  I think the government is moving ---

MR. SADOW:  But I would like to be able -- I'm sorry.

41

It's hard -- I don't see Your Honor so it's hard.  I apologize.

THE COURT:  That's okay.

MR. SADOW:  I would like -- I understand the discovery -- okay.  Go ahead.  I'm sorry.  There we go.  I can see you now.  Please, sir.

THE COURT:  No.  Go ahead.

MR. SADOW:  Okay.  What I was going to say is I would now ask since we're moving along the lines that I'm already a member of the bar I would like to have just the identity evidence; that is, what the government is going to rely upon at the forthcoming detention hearing turned over in advance of the hearing.  I need as much time as I can on that.  It seems to me that that is separate and apart from all of the other type of evidence that the government has made reference to.

So I would ask the Court to exercise its discretion if we're going to have a detention hearing Tuesday or Wednesday, for example, maybe the government could get me the identity evidence by midday, noon or so, on Monday so I'll know what I am up against.  This is -- I ask for this because this is something that was unexpected.  It was never brought up previously and I want to be able to address it appropriately in a detention hearing.

THE COURT:  Mrs. Rhodes?

MRS. RHODES:  Judge, I don't have a problem.  I can get that to him.  I will just, for the record, represent that

42

will not be our only basis for detention.

THE COURT:  Okay.  Are you satisfied with that, Mr. Sadow?  She said she will get that to you within the timeline you've indicated, and maybe if there are additional areas that are going to be explored aside from the nature of the charges at the hearing then you can inquire about that offline with her and if y'all have any continuing issues in that regard, you can always notify my office.  I'll get on the phone with y'all just as quickly as I can to talk about that.

MR. SADOW:  That's very satisfactory.  I appreciate that.

THE COURT:  Okay.  I am not going to enter a scheduling order quite yet.  Normally, I would go ahead and do it after I hear from the first defendant or several, but since he is only one of many and we will see these other lawyers pretty soon from now -- hopefully, next week they'll have them and get back together -- I'll be able to get their sense of how long they think they need as well and then I can put together an order -- scheduling order -- for everybody that makes the most sense, but I appreciate your comments in terms of how much time you need based on, of course, what you know so far, and we'll enter that scheduling order after I hear from the others.

What about expert disclosures?  How much time do you think -- the same kind of estimation in terms of how long we need for that?

43

MR. SADOW:  Yes, Your Honor.

THE COURT:  Okay.  All right.  I want to talk with the defendants for just a moment about what you just heard because that's what I always call "lawyer speak" and if I were in your shoes I wouldn't understand a lot of it.  At bottom if I sat down and talked with each of you individually over a cup of coffee now and said, you know, you've got this indictment.  You have a lot of information in the Indictment and they're charging you with a fair amount of activity.  What do you think ought to happen next?  I think each of you would say, well, the first thing that needs to happen is the government should give us their investigative documents so we can get together with our lawyer and gauge the strength of the government's case, the strength of our defense, and start to make decisions about how we get ready for trial, and, thankfully, we live in a country where a lot of times what your gut tells you is fair is what our rules say and, surely enough, Federal Rule of Criminal Procedure 16 obligates a prosecutor in a case like this to disclose so much of the investigative files to you.  The local rules of this court also talk about those same prosecutorial disclosure obligations.

The Supreme Court of the United States from time to time has issued decisions that further provide guidance about what a prosecutor must disclose in a case like this.  Cases you may have heard of before -- *Brady*, *Giglio*, and *Jencks* are the

three most well known of those cases and Congress from time to time will also enact legislation wholly apart from Rule 16 that touches on these prosecutorial disclosure obligations and so all the lawyers in the room -- they understand what needs to happen and what you heard from the prosecutor is very important.

She stood up and gave an absolute unconditional assurance to all the defendants and the Court that she has met with everyone who is part of the investigative team on this case. She's gathered from them all of the information that is relevant to this case. She's reviewed all that information and at the very beginning of the case has a tremendous volume of information that she is going to give to your attorneys by the way of a hard drive where all of that information will be saved and then will allow a period of time after I talk with all the defense lawyers we'll decide how much time for you to get together with your attorneys and look through that information and talk about what to do next with your case and, really, the two big decisions are whether you're going to file any pretrial motions in the case or whether instead you're going to focus on getting ready for trial.

Pretrial motions are simply documents filed with the court in advance of trial asking the court to take certain actions. Sometimes it is asking for suppression of evidence. Other times it might be asking for dismissal of a charge, et

cetera.  In some cases and for some defendants pretrial motions are necessary and important and should be filed.  In other cases and for other defendants, quite frankly, it can be a complete waste of time.  It just depends on a number of factors like the nature of the charges, the manner of the investigation and how it was conducted, et cetera -- a host of factors that your attorneys learned in law school and have been applying their whole career.  So after we get to that point where they are able to review the information with you, they'll let you know their professional decision about whether to file pretrial motions or instead whether to focus on getting ready for trial.

Do you understand that explanation of what just happened, Mr. Denis?

DEFENDANT DENIS:  Yes, Your Honor, I understand.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  Yes Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  Yes, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  Yes, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  Yes, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  Yes, Your Honor.

THE COURT:  And Mr. Labat?

46

DEFENDANT LABAT:  Yes, Your Honor.

THE COURT:  Now I want to assure the ones of you here today without an attorney you haven't really missed anything. You're going to get the same information in a hard drive from the prosecutor as Mr. Denis and his client.  It is just going to be a week or so behind in terms of when you get that information, but we're going to set a schedule to give everybody enough time to look through that information and make these decisions that need to be made.

All right.  What about detention versus release on bond, Mrs. Rhodes?  What is the government's position as to each defendant?

MRS. RHODES:  Your Honor, the government is seeking detention on Rony Denis and Anthony Oloans.  We concur with the pretrial services reports on the remaining defendants which I believe each are virtually identical which requests $50,000 security with 10 percent down.

THE COURT:  Okay.  Have you looked at the other proposed conditions of release and, if so, do you have any objections to those?

MRS. RHODES:  The conditions of release?  Yes, I have. I concur with all of those conditions.

THE COURT:  Okay.  All right.  Is the government ready to proceed with the detention hearing today with respect to Mr. Denis and Mr. Oloans or does the government need time to

prepare?

MRS. RHODES:   Judge, the government would be requesting three days for each of those hearings.  I am also requesting that they be handled separately.  There are kind of different issues for each one.

THE COURT:   Okay.

MRS. RHODES:   I know that Mr. Sadow -- we spoke yesterday and I had suggested Wednesday.  I didn't know if he would be requesting five days, but based on the government's three-day continuance we would request a hearing on Wednesday for Mr. Denis and I am not sure who -- if Mr. Grubman is going to be representing Mr. Oloans, then we could discuss when that could be set.

THE COURT:   Okay.  Mr. Sadow, first of all, I like to get everybody's name right and I think I might be in error here because Mrs. Rhodes has referred to you as Sadow several times.  Who is right and who is wrong?

MR. SADOW:   You're right.  She's wrong.

THE COURT:   Oh, okay.  All right.  Mr. Sadow, what is your response in terms of when you'd like to detention hearing to occur?

MR. SADOW:   Well, I think the government's three days actually runs Tuesday, but I would ask for an additional day since I also have that option and Wednesday would be fine with me.

THE COURT: Okay. Well, I'll let y'all talk about the specifics of when we begin that day. My calendar is pretty open. So y'all coordinate that and get with Mrs. Capps by email or phone to set that down for that day.

And, Mr. Oloans, the government has asked that you be detained rather than released on bond which means that I cannot release you today; right? I mean, if the government has asked that you be detained, you have to be detained at least until we have that bond hearing which cannot occur until you have an attorney by your side which is why it is so very important that you start that process. Do you understand that?

DEFENDANT OLOANS: Yes, Your Honor.

THE COURT: Typically, we have a bond hearing the same day that I first see you or within several days after that and so we don't want you to languish and not have that hearing as soon as we possibly can.

All right. With respect to the remaining defendants, you will be released on bond today.

One issue that I have, Mrs. Rhodes, is that, you know, in so many other cases we have we don't require a cash component here. I don't have any financial information for these defendants right now except for two, and the two for which I have financial information from them I'm afraid that if I do the $5,000 cash component right now that it's going to hurt their ability to receive -- to be able to hire an attorney

based on the information that I have right now and so I don't want -- and, quite frankly, the cash component of this to me is not a big motivator in terms of compliance anyway, and so trying to balance all of those things I believe the best thing right now might be to release all of these defendants with no deposit required and revisit the issue once they have counsel and we have better information about the finances.  Do you have any objection to that?

MRS. RHODES:  I do and I do because I do have the financial information of these defendants and I can give the Court an example of something that I have from the investigation if you think that is appropriate.

THE COURT:  I don't right now because they don't have lawyers and so we really can't have a merits-based discussion about those finances until we do that, and so, like I said, I don't think the cash amount is sufficient such that it ought to delay their release on bond if the government believes they should be released, but one component of that is whether the $5,000 is an obstacle to these defendants such that they can't gain release without it.

Mr. Fryar, what about you?  The government has asked that there be a $5,000 cash component of the $50,000 bond amount which means that until you posted the 5,000 if I agree with the government you could not be released.  Would that be an obstacle or would you be able to post the $5,000 in cash?

DEFENDANT FRYAR:  That would be an obstacle, Your Honor.

THE COURT:  Okay.  What about you, Mr. Nostrant?

DEFENDANT NOSTRANT:  That would be an obstacle, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  That could be an obstacle, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  That would be an obstacle, Your Honor.

THE COURT:  And Mr. Labat?

DEFENDANT LABAT:  That would be an obstacle, Your Honor, and -- I'm sorry

THE COURT:  So what we're going to do is release y'all on a $50,000 bond with no cash component today, but I am going to reserve the right when I see you next to have financial information at my fingertips where I can decide whether that cash component should be a requirement, and if I impose that and you can't meet it, then you'll be detained at that time.

Certainly, I don't want y'all to think this means that a bond violation will not have any repercussions on your financial condition because there is a $50,000 bond amount that will be in place for each of you.  What does that mean?  It means that if you're accused of a bond violation and we have a

hearing and I find that you committed that bond violation, you will lose $50,000.

In federal court we don't have a bail bondsman system where you have to go out and hire a bail bondsman to come and post the cash for you, et cetera. Why? Because it is the federal government. We have no doubt that if I forfeit a $50,000 bond amount that you're going to pay every cent of that plus interest at some point before you leave this earth; right? So understand that a mistake will cost you $50,000 and so don't think that this cash part of it -- the fact that you don't have to put any cash down -- means you won't lose anything.

All right. So I am going to go through the conditions of your release with you now and you'll receive a copy of these conditions. You'll have a chance to meet with Mr. Brownlee before you leave here today if you haven't already to talk about these conditions. We take all of these conditions very seriously. If you or your family members have any experience with being on supervision in another court somewhere else, I want you to forget about that; right? This is very different.

In federal court we have plenty of resources at our fingertips in terms of staff and training to be able to effectively supervise each and every defendant that we have. So each of you is a very important person to the probation officer and me and when I release someone after talking with them about these conditions and we find that you've committed a

violation the consequences from that are pretty automatic and pretty harsh.  You know, it is forfeiture of the $50,000 bond amount and it is putting you in jail until the trial of your case.

Now spending one night in jail is unfortunate enough.  We all know that, but I think right now you need to think about it being more than just an immediate deprivation of your freedom and liberty.  Instead, you need to think about the impact it could have on your case.  Undoubtedly, in your lifetime this is probably the most important legal case you've ever been involved in or ever will be involved in; right?  You've heard the allegations.  You've heard the penalty certification and the maximum penalties that could be imposed for these offenses and so if you violate these bond conditions and you're jailed until trial it will have an effect on your attorney's ability to prepare for trial with you; right?

If you're out on bond you'll be able to travel to your attorney's office and meet with him or her as they need you to meet with him or her according to their schedule and they'll have their staff there with them and you can stay as long as the attorney needs you to stay and the closer you get to trial the more they'll need you to be there and don't think for a minute that an attorney can try this case without you.  They need your cooperation.  They understand the law.  They understand how to try a case but you know the facts and so you

have to be a team that works together.

Now you can imagine that if you're in a team with someone and then you're put in jail it changes the dynamic of that relationship dramatically; right?  It means that now the attorney has to find time out of their day to drive at least 45 minutes to an hour and 15 minutes to the jail where you are. They can only bring so much stuff with them.  They can only stay so long while they're there, and so, yes, it does have an effect on your case.  So the best way I think you can help your attorney help you is to abide by these bond conditions.  You might ask yourself why are we imposing all these strict conditions on you.  You understand your rights.  You understand that in our country where we value freedom so greatly and prioritize the administration of justice in the way that ensures your rights, you understand that you're presumed innocent of these charges and you also understand that the only way that presumption ever goes away is if a jury at the trial of your case unanimously decides that the government has carried its very significant burden of proving you guilty beyond a reasonable doubt.

And so you might say, well, if that's true, if I am presumed innocent sitting here today, why are you getting involved in my life?  Why are you imposing all of these conditions on me between now and the time of trial?  We impose these conditions because a grand jury has already met with the

prosecutor without you being there and, of course, without you having any say-so. They presented their case to the grand jury and a grand jury issued an indictment by making a finding of probable cause -- a finding of probable cause with respect to the charges that you face. So now you're under suspicion of having committed these offenses.

These charges are pending and so I think all of you would agree with me that it makes sense in our country that when someone is under suspicion of having committed a crime, until they get to trial -- after the indictment issues until the time of trial we have to be very careful. We have to make sure at least three things happen: Number one, most importantly, that our community is protected -- right? -- until guilt or innocence is determined; number two, we have to make sure that you show up for your case as required; and, number three, these things are for your benefit, too -- we need to make sure that you are living the kind of life that means you'll be in the proper mindset to make the very important decisions that you have to make as you go through this process and to be part of that team with your attorney.

So we can't have you smoking marijuana. We can't have you using cocaine or staying out until 2 o'clock in the morning; right? We can't have you doing those things. So each of these conditions I am about to read to you have at least one of those three goals in mind: Protection of the community,

making sure that you show up for court, and making sure you're in the right frame of mind to participate in your case with your attorney.

All right.  So these conditions, as I said, you will receive if you haven't already a copy of.  We will -- once you have an attorney by your side we'll talk about these conditions and whether the attorney has any objections or concerns about these conditions, and, if so, we'll talk about whether we need to modify them at all.

All right.  So the conditions are as follows:  You must submit to supervision by and report for supervision to your supervising officer.  If you have employment you need to continue in that employment.  If you don't have full-time employment and you're not retired, then we're going to make sure that you seek employment and obtain a job where you're working at least 40 hours a week.  If you have a passport you must surrender that to your supervising officer and do not make an attempt to obtain another passport or international travel document.  You must restrict your travel to the -- if you don't live in the Southern District of Georgia, you must restrict your travel to the district where you live.

Mr. Brownlee, do you know whether any of these defendants reside outside of the district?

THE PROBATION OFFICER:  From our understanding, none of them.  Just one, but he is not -- he's already been seen.

THE COURT: All right. So you must restrict your travel to the Southern District of Georgia. We'll give you a map of that district or you can access it online if we don't have one for you. Basically, our district starts just north of here and goes down all the way to the Florida line on the eastern side and on the western side it is bordered, generally speaking, by Waycross and Dublin. So Macon is outside the district. Atlanta is outside the district. North Augusta is outside the district. If you go over the bridge right here you're outside of the district if you're in South Carolina. So understand the geographical boundaries of our district and stay within them. If you need to leave the district for a very important reason like work or medical appointments or a funeral of someone who is very dear to you, you're going to need to get advanced approval from your probation officer before you leave the district for any purpose like that.

Avoid all contact directly or indirectly with anyone who might be a witness in this case or a co-defendant. There is one exception to that. You can have a conversation with such people if your attorney believes one is necessary to prepare for trial, your attorney arranges for that conversation to occur, and your attorney participates in that conversation. Otherwise you should not have any contact or communication with a co-defendant, or anyone who is likely to be a witness at trial of the case.

Do not possess a firearm, destructive device, or other weapon.  Do not use alcohol excessively.  Do not use or unlawfully possess a narcotic drug or other controlled substance as defined in the United States Code unless prescribed by a licensed medical practitioner.  What does that mean?  Stay away from any drug of any kind except for prescription medication that's in your name and not expired and medication that you can find in any pharmacy over the counter for colds and flus and sore throats and things like that. Marijuana is prohibited.  Do not use marijuana.  Even though in some states it's legal, it is certainly not in Georgia and certainly not allowed under these conditions.  If your probation officer deems it necessary, you'll need to submit to random testing for drug use.

And that is all in terms of -- well, report as soon as possible to your supervising officer every contact that you have with law enforcement personnel including any arrests, questioning or traffic stops.  You must provide your probation officer with access to any requested financial information and authorize the release of any financial information.  You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.  You shall not maintain more than one financial institution account or be a signer on a financial institution account without the prior approval of the probation officer.

58

You shall notify of this Indictment and the nature of the allegations contained therein any current employers, prospective employers, and any other entity with whom you enter into any type of business or employment relationship.  You shall not be employed in any fiduciary capacity or any position allowing access to credit or personal information of others unless your employer is aware of the charges and the probation office approves the employment.

You shall not volunteer in any fiduciary capacity or any position allowing access to credit or personal information of others unless the entity for whom you're volunteering is fully aware of the pending charges and the U.S. Probation Office approves such volunteer work.  You shall not be employed in any position of public or private trust and shall inform any employer or potential employer of the pending charges if directed to do so by the supervising officer and you must comply with the requirements to provide proof of income if disabled and receipt of benefits.

The other thing is a curfew.  We do have a curfew of 10 o'clock p.m. to 6 o'clock a.m.  During those hours you must be in your residence that's on file with the probation officer. It's very important that you be here for court on time every time.  There is nothing wrong with being 30 minutes early for court.  That way if something happens you can recover and still be here.  The further you live away from here, obviously, the

earlier you need to arrive to make sure that you're here and not late because we do try to start on time and it is very important for you to be here.  If you fail to attend a hearing that's called in your case, that does constitute a crime in and of itself for which you could be sentenced to a term of imprisonment.  So we want to make sure you're here.

THE COURT:  Mr. Brownlee, did I miss anything in terms of the conditions?

THE PROBATION OFFICER:  No, Your Honor.

THE COURT:  Okay.  Mrs. Rhodes, anything further in that regard?

MRS. RHODES:  No, sir.

THE COURT:  All right.  Now in terms of -- one last thing.  I am going to inquire about your citizenship and the only reason why I do that is because if you have -- I am required to because if you have citizenship in another country other than the United States there are some additional rights I'll need to explain to you.

So, Mr. Denis, do you have citizenship in a country other than the United States?

DEFENDANT DENIS:  No, Your Honor.

THE COURT:  Mr. Oloans?

DEFENDANT OLOANS:  No, Your Honor.

THE COURT:  Mr. Fryar?

DEFENDANT FRYAR:  No, Your Honor.

THE COURT:  Mr. Nostrant?

DEFENDANT NOSTRANT:  No, Your Honor.

THE COURT:  Mr. Robertson?

DEFENDANT ROBERTSON:  No, Your Honor.

THE COURT:  Mr. Reip?

DEFENDANT REIP:  No, Your Honor.

THE COURT:  Mr. Labat?

DEFENDANT LABAT:  No, Your Honor.

THE COURT:  We've covered a lot and I think we've potentially covered everything.  Is there anything further from the government's position we need to talk about?

MRS. RHODES:  Your Honor, there is something I would like to take up at sidebar with the lawyers that are here.  I don't know how we're going to get Mr. Sadow, but I think I need to bring this to the Court's attention if I can approach sidebar.

THE COURT:  Well, I mean, so two of the three lawyers are not here in a representative capacity ---

MRS. RHODES:  Your Honor, this has to do with people in the audience.

THE COURT:  Okay.  All right.  Maybe the best thing we need to do then is clear the courtroom.  No?

MRS. RHODES:  Your Honor, I would ask not to clear the courtroom --

THE COURT:  All right.

MRS. RHODES:  -- and I can explain at the bench.

THE COURT:  Okay.  All right.  Well, let's -- I normally -- you know me; I don't like to have these very often, but if you think it is absolutely necessary, let's do it.  I don't know how we're going to have Mr. Sadow participate.

Is this microphone over here, Mrs. Capps, one that he'll be able to ---

THE CLERK:  Yes, sir, that's the sidebar microphone.

THE COURT:  But will he be able to hear that?

THE CLERK:  No, sir.

THE COURT:  We're not going to be able to do it with Mr. Sadow.

MRS. RHODES:  I think this is an important issue --

THE COURT:  Sure.

MRS. RHODES:  -- that needs to be brought up.

THE COURT:  All right.  So what we could do is just do a sidebar and call him on the telephone to have him participate that way.

MRS. RHODES:  That's fine.

THE COURT:  Can we do that?  And do we have his number?  We don't?

MRS. RHODES:  I have it.

MR. SADOW:  I certainly can give it to the Court.

THE COURT:  Well, there are a lot of people in here. Mrs. Rhodes says she has it.  We'll call you momentarily.

(A bench conference is held as follows.)

THE COURT:  Let's get Mr. Sadow on.  Probably the best thing to do is for you to hear him talk.  I'll still hear you.

MRS. RHODES:  Okay.

THE COURT:  If you put him on speaker you can talk to him.

MRS. RHODES:  That's fine.  Can you hear me?  Okay.  So in order for it to be like you're in the courtroom, I'm just going to let you hear what we're saying and if you have something to say I'll hand the phone to the Judge.  Okay?  So (inaudible).

(The parties get closer to the microphone.)

MRS. RHODES:  All right.  Let me start over.  There are three women sitting at defense counsel table and three men behind them.  I know for a fact that some of them are members of the House of Prayer because I have pictures of them.  They represented to Mrs. Capps that they were with attorneys and there are no attorneys here other than --

THE COURT:  No.

MRS. RHODES:  -- Rafferty and Scott (inaudible) who I don't believe that we are affiliated with him at all ---

THE COURT:  Okay.

MRS. RHODES:  -- and let me just go further to say --

THE COURT:  So you think, basically, they lied so they could stay in here?

MRS. RHODES:  Not only do I think they lied, I think they are recording us, and my basis for that is the history of this group.  They have -- they are over there ferociously taking notes and I looked down and one of the women has two purses sitting at her feet and it's been known that Rony Denis would provide recording devices to these children who they would put it in their purses and I am incredibly uncomfortable with these ladies sitting next to me.

THE COURT:  Okay.  So you got two concerns.  The first is they lied so they could stay in here.

Mr. Sadow, the history on that ---

MRS. RHODES:  (inaudible) of the bar.

THE COURT:  The history of that is that we -- the priority here because we have a full courthouse was to allow, number one, attorneys, number two --

MRS. RHODES:  Agents.

THE COURT:  -- media and family --

MRS. RHODES:  And agents.

THE COURT:  -- and agents and so they represented to the Court Security Officers that they are part of a legal team and that's the only reason why they were allowed to stay in here.

MRS. RHODES:  On this side of the bar.

THE COURT:  Yeah, so they're at counsel table.

MRS. RHODES:  It's very uncomfortable.

MR. SADOW:  (inaudible) the individuals that you're referring to ---

THE COURT:  I'm sorry?

MR. SADOW:  I said, Your Honor, I don't know the identities of the people that you're referring to.

THE COURT:  Right.  Yeah, it's difficult for you to. So I think probably the easiest thing for me to make sure the inquiry -- I mean, the main thing I am worried about is not so much the fact that -- what I am worried about is them getting the perception that we're going to let them be fast and loose with things.

MRS. RHODES:  That's ---

THE COURT:  That's really it at the end of the day and so the ones, though, that you're talking about are the three sitting at counsel table.

MRS. RHODES:  And the three men behind them.  I think they're husband and wife.

THE COURT:  Okay. All right.  Well, let me make some inquiry.  I think it's important to do that.

MRS. RHODES:  And I don't know if you want to clear the courtroom or let the rest of them hear.  That's up to you. That's your job.

THE COURT:  All right.  Mr. Sadow, do you have any further thoughts before we reconvene?

MR. SADOW:  I think it would be wisest -- I don't know

65

what the Court's pleasure would be, but I think it would be wisest to inquire of those it sounds like six people that you do so after the courtroom is empty so that they're not put on the spot so there's not a problem with the people that are there, but, again, I don't know how difficult that is for the Court to do.

MRS. RHODES:  I mean, I think the whole group of them needs to understand what's going on.

THE COURT:  Okay.  All right.  Thank you, Mr. Sadow.

MR. SADOW:  Yes, sir.

MRS. RHODES:  Thank you, Judge, and I'm sorry that was ---

(Bench Conference Ends.)

THE COURT:  Okay.  Before we leave there is one kind of oddball thing we need to address.  The three people sitting at counsel table and the three men behind you, I want y'all to approach the lectern.  All right.  I am going to have each of the -- is that everybody?  One more.  All right.

Mrs. Capps, could you please swear in all six of these individuals?

THE CLERK:  Yes, sir.

THE COURT:  And make sure you get their names.

THE CLERK:  Yes, sir.

(Karina Acosta, Sarah Elaine Derby, Jeffrey Seth Derby, Randy Edward Bercini, James Blaine Benton, and Prescilla

66

Bercini are duly sworn.)

THE CLERK:  Would you please state your full name for the record and speak loudly.

MS. KARINA ACOSTA:  Melody (Phonetic) Karina Acosta.

MS. SARAH ELAINE DERBY:  Sarah Elaine Derby.

MR. JEFFREY SETH DERBY:  Jeffrey Seth Derby.

MR. RANDY BERCINI:  Randy Edward Bercini.

MR. JAMES BENTON:  James Blaine Benton.

MRS. PRESCILLA BERCINI:  Prescilla Bercini.

THE CLERK:  Thank you.

THE COURT:  All right.  I didn't write those down so I want to make sure I have them.

Ms. Acosta?  Is that right?

MS. KARINA ACOSTA:  About to be Diaz.

THE COURT:  I'm sorry?

MS. KARINA ACOSTA:  Soon to be Diaz (inaudible).

THE COURT:  Yes, but I didn't ask you future.  Today.  Right now.  What's your name?

MS. ACOSTA:  Acosta right now.

THE COURT:  And your name?

MS. SARAH ELAINE DERBY:  Sarah Derby.

THE COURT:  Derby.  And?

MR. JEFFREY SETH DERBY:  Jeffrey Seth Derby.

THE COURT:  Derby.  And?

MR. RANDY BERCINI:  Bercini, Randy.

THE COURT:  Grandy? [sic]

MR. RANDY BERCINI:  Randy with a "Y".

THE COURT:  All right.

MR. JAMES BENTON:  James Benton, Your Honor.

THE COURT:  All right.

MRS. PRESCILLA BERCINI:  Prescilla Bercini.

THE COURT:  Bercini.

All right.  The first question while you're under oath, do you have any recording device on you, Ms. Acosta?

MS. KARINA ACOSTA:  No, sir.

THE COURT:  Mrs. Derby?

MS. SARAH ELAINE DERBY:  No, sir.

THE COURT:  Mr. Derby?

MR. JEFFREY SETH DERBY:  No, sir.

THE COURT:  Mr. Grandy?

MR. RANDY BERCINI:  No, sir.

THE COURT:  And Mr. Benson?  Benton?

MR. JAMES BENTON:  Benton.  No, Your Honor.

THE COURT:  And Mr. Bercini?  Mrs. Bercini?

MRS. PRESCILLA BERCINI:  No, Your Honor.

THE COURT:  Ms. Acosta, did you bring any device that's capable of recording into this courtroom today?

MS. ACOSTA:  No, sir.

THE COURT:  Mrs. Derby?

MS. SARAH ELAINE DERBY:  No, sir, Your Honor.

THE COURT:  Mr. Derby?

MR. JEFFREY SETH DERBY:  I did.

THE COURT:  Okay.  And where is that device located now?

MR. JEFFREY SETH DERBY:  I have it right here in my front pocket.

THE COURT:  And what is that device?

MR. JEFFREY SETH DERBY:  It's a pen that has the capability to record.

THE COURT:  Okay.  And did you record this proceeding?

MR. JEFFREY SETH DERBY:  Yes, I did.

THE COURT:  Okay.  And Mr. Grandy?

MR. RANDY BERCINI:  No, sir.

THE COURT:  Mr. Benton?

MR. JAMES BENTON:  No, Your Honor.

THE COURT:  And Mrs. Bercini?

MRS. PRESCILLA BERCINI:  No, Your Honor.

THE COURT:  Okay.  So, Mr. Derby, why did you bring that in here and why did you record?

MR. JEFFREY SETH DERBY:  Yes, I -- I just -- just to have a recording and to -- for my own use if I ever need to hear and remember what was said.

THE COURT:  Okay.  And did someone instruct you to bring that device here to record?

MR. JEFFREY SETH DERBY:  No, sir, Your Honor.  No,

Your Honor.  I'm sorry.

THE COURT:  Did you understand before you walked into this courtroom that that is absolutely prohibited in this court?

MR. JEFFREY SETH DERBY:  I -- honestly, I thought cellphone, but I did not know recording device.

THE COURT:  I'm sorry?

MR. JEFFREY SETH DERBY:  I knew cellphones, but I did not know a pen.

THE COURT:  So walking in here today you had no idea that you were prohibited from recording this proceeding and you are prohibited from bringing a recording instrument into this courtroom?

MR. JEFFREY SETH DERBY:  I'm sorry.  Can you say that again, Your Honor?

THE COURT:  Walking in here today for this hearing you believed that you could bring a recording device into this courtroom and that you were allowed to record?

MR. JEFFREY SETH DERBY:  Yes, your Honor.  In my mind I thought cellphone -- cellphones are not allowed, but as far as having a pen with the capability to do that, I did not know. I did not know it was prohibited and I didn't look -- I just -- I was just coming in very quickly and I didn't read all the signs.  I just came in.  I did not know.

THE COURT:  How long have you owned that device?

MR. JEFFREY SETH DERBY:  I -- it's -- I've had this device -- I can't -- I could find out.  I know it's been at least three, four years.

THE COURT:  Did you purchase that device?

MR. JEFFREY SETH DERBY:  Yes, Your Honor.

THE COURT:  Where did you purchase it?

MR. JEFFREY SETH DERBY:  It was -- it was through like online, like a different online store.

THE COURT:  Okay.  That is the kind of device that you bring somewhere where you don't want people to understand that you're recording so they don't see that you're recording something.  Is that the reason why you brought a device that looks like a pen in here so that no one would understand you were recording?

MR. JEFFREY SETH DERBY:  I knew a cellphone.  As far as a pen, it's discreet and not to draw attention.

THE COURT:  Not to draw attention.  In other words, so you could walk in here and no one would understand that you were recording; is that correct?

MR. JEFFREY SETH DERBY:  Correct.  Yes, Your Honor.

THE COURT:  Okay.  All right.  Now, Ms. Acosta, do you work in the legal profession?

MS. KARINA ACOSTA:  No, Your Honor.

THE COURT:  Okay.  Mrs. Derby?

MS. SARAH ELAINE DERBY:  No, sir.  No, Your Honor.

THE COURT:  Mr. Derby?

MR. JEFFREY SETH DERBY:  No, Your Honor.

THE COURT:  Mr. Grandy?

MR. RANDY BERCINI:  No, sir.

THE COURT:  Mr. Benton?

MR. JAMES BENTON:  No, Your Honor.

THE COURT:  And Mrs. Bercini?

MRS. PRESCILLA BERCINI:  No, sir.

THE COURT:  Okay.  My understanding is that each of you represented to our Court Security Officers that you, in fact, were associated with a law firm or an attorney and that that is how you were able to remain in court here today and you understand that you're under oath and what you're saying here is being recorded and so I need an honest answer from you as to whether that is true or not.

Ms. Acosta, did you make any such representations in order to remain in this courtroom?

MS. KARINA ACOSTA:  No, Your Honor.

THE COURT:  Mrs. Derby?

MS. SARAH ELAINE DERBY:  No, Your Honor.

THE COURT:  Mr. Derby?

MR. JEFFREY SETH DERBY:  I'm sorry, your Honor.  I didn't quite understand.

THE COURT:  Did you make any representations to any Court Security personnel here that you were associated with any

lawyer or law firm?

MR. JEFFREY SETH DERBY:  No, Your Honor.

THE COURT:  Mr. Grandy?

MR. RANDY BERCINI:  No, sir.

THE COURT:  Mr. Benton?

MR. JAMES BENTON:  No, Your Honor.

THE COURT:  And Mrs. Bercini?

MRS. PRESCILLA BERCINI:  No, sir.  We did not.

THE COURT:  Okay.  All right.  Mrs. Rhodes, any follow-up?

MRS. RHODES:  No, Your Honor.

THE COURT:  Okay.  I am just taking a minute for this to sink in -- the importance of where we are and what has just occurred -- and I want the six of you to understand that this is just the beginning of this inquiry and not the end of it, and I want everybody in this room from each defendant to everybody who is here attending this event to understand that this is a critically important proceeding and that the federal judiciary will not be tampered with, interfered with, or misrepresented to, and the consequences of engaging in such conduct will be severe.

And that recording device that you brought here will not leave with you.  It shall stay.

MR. JEFFREY SETH DERBY:  Yes, Your Honor.

THE COURT:  Hand it to Mrs. Capps right now.  You can

retrieve that back after we are 100 percent certain that everything recorded here today has been removed.

MR. JEFFREY SETH DERBY:  Yes, Your Honor.

THE COURT:  All right.  Anything further from the government?

MRS. RHODES:  No, Your Honor.

THE COURT:  Mr. Sadow?

MR. SADOW:  No, Your Honor.

THE COURT:  Okay.  I do think there is one other thing we ought to talk about before we leave.  You know, I talked about the importance earlier about these defendants understanding that as you go out on bond you are not to have any conversation with a co-defendant or anybody who is a likely witness at the trial of this case, and given the behavior that we've seen here today, I want y'all to make -- to be absolutely sure you understand the critical importance of that.

The very foundation of our judicial system is the ability of a witness to walk into court, be sworn under oath, and to tell the truth without any fear of any adverse consequences or repercussions, and so any attempt to interfere with them, to harass them, to intimidate them, to affect the substance of their testimony is something that you, I think, would understand is treated very seriously and there are federal criminal statutes that apply that have just as hefty of penalties as the one that we've discussed here today and so do

74

not make any attempt to communicate with a likely witness or a co-defendant.  Court is adjourned.

MR. SADOW:  Your Honor, excuse me.

THE COURT:  Yes, Mr. Sadow?

MR. SADOW:  The only question I have -- is the government going to file a motion for detention so that I am notified as to the specific grounds as to which they are arguing detention is warranted?

THE COURT:  Mrs. Rhodes?

MRS. RHODES:  I was not planning to.  We just move for detention under the statutory factors, Your Honor.

THE COURT:  It's not been our practice in this court to do that in the 12 years I've been here, Mr. Sadow.

MR. SADOW:  Well, the only reason I raised it is because this is not a rebuttable presumption case and such things as dangerousness comes into play once you get to the question of whether there has been another violation of the statute unless they're arguing that dangerousness.

THE COURT:  So, I, you know --

MRS. RHODES:  Your Honor, I ---

THE COURT:  -- I come from a civil background and so I, you know, whenever I was in a court I always, you know, fully prepared for ---

MRS. RHODES:  Uh-oh.

THE COURT:  Mr. Sadow, are you there?

MR. SADOW:  I am.  You were kind of gone for a minute, Judge.  Sorry.

THE COURT:  Yes, I kind of went off the reservation in my remarks, too.  I started talking about civil law, but the point being that in my civil practice we always had plenty of notice of all the arguments that were going to be made in advance and it does appeal to me to have that happen, but I feel certain that Mrs. Rhodes, if you talk to her offline about this, will give you all the information that you need to adequately prepare for this hearing in terms of the various bases that they're going to be relying on both factual and legal.

Mrs. Rhodes, would you agree with that?

MRS. RHODES:  Your Honor, what I would say is that I will state here today that that's the statutory reason that I am going to be seeking detention is risk of flight and that is primarily based on the identity issue, danger to the community, and we're also moving under (f)(2)(B) which is serious risk that such person will obstruct, attempt to obstruct justice or threaten to injure, intimidate, or attempt to threaten, injure or intimidate prospective witnesses.

THE COURT:  Okay.  As to the details underlying those things, you don't have any problem sharing that with him in advance?

MRS. RHODES:  Your Honor, there's -- I can provide the

-- I can provide the immigration file because it is sort of -- it is a compact, unique piece of evidence.  The rest of the information is -- it's so voluminous.  I mean, I will provide the things that I can get my hands on, but even I can't get some of my documents.  I have to rely on my agent to try to find certain documents because of the massive amount of discovery.  I mean, I'll do my very best, but I cannot make a promise.  I know I can get my hands on my immigration file because it is one big file.

THE COURT:  Well, I mean, so what I'm thinking about is an iterative process -- right? -- where you get on the phone with Mr. Sadow and you talk about these various bases that you've raised here today, give him kind of an outline of what the arguments will be and ---

MRS. RHODES:  Well, Judge, I don't -- I really -- I don't want to -- I don't want to reveal my strategy.  I think that is not -- I'm going to tell him the statutory basis.  Even if I were to file a motion I wouldn't put all the facts in the motion.

THE COURT:  Right.

MRS. RHODES:  And I am going to provide him with what he's asked for in terms of the immigration file, but the -- this case file literally dates back to 2004 and trying to get through all of the discovery has -- is quite a task and I don't -- I guess my -- I think part of my issue is I'm trying to get

this case -- the detention hearing ready myself without also having to then filter through what's in the discovery because -- and I'll go ahead and represent to the Court and to Mr. Sadow I plan on calling one witness on the immigration aspect of this case and I plan on proffering the remainder of the evidence.

THE COURT:  Okay.  In terms of exhibits, will you have those?

MRS. RHODES:  I'm sorry?

THE COURT:  Will you have exhibits?

MRS. RHODES:  Yes, sir.

THE COURT:  Okay.  Do you already have those exhibits?

MRS. RHODES:  I have -- well, they're not in -- I mean, most of the exhibits come from the immigration file --

THE COURT:  Okay.  And so are you ---

MRS. RHODES:  -- and he is going to have the whole thing.

THE COURT:  Okay.  Are you willing to share those exhibits with him in advance of the detention hearing?

MRS. RHODES:  Yes, I am going to give him the immigration file.

THE COURT:  Okay.

MRS. RHODES:  If I have other exhibits that are not part of that, I will share them with him once I have them in final order.

THE COURT:  Okay.  Well, Mr. Sadow ---

MR. SADOW:  I ---

THE COURT:  Go ahead.

MR. SADOW:  Yes, sir.  I appreciate that.  I hear -- of course, what the prosecutor has said.  The only issue I'm having right now is -- maybe I misunderstand the statute, but dangerousness is not -- under the statute dangerousness does not fall into the statute for these offenses.  That's not to suggest that it doesn't become a factor at some point, but it's not a separate and independent ground under the statute for the offenses for which he's been charged.

THE COURT:  All right.

MR. SADOW:  And that's my objection now and I just want to make sure that it's on record because if she wants to give me the statute for the dangerousness, I'll be more than happy to look at it, but I've researched this going in and I don't think it exists.

THE COURT:  Okay.

MRS. RHODES:  We'll operate under whatever prongs are available to us, Your Honor.  I mean, I think the primary prong we're operating under is that this man is not who he says he is.

THE COURT:  Okay.

MR. SADOW:  That I understand completely.

THE COURT:  All right.  Well, we're going to have to

full and fair chance to argue these things at the hearing next week, but I do want to tell y'all that I'll make myself available in advance if y'all have some kind of dispute about what Mrs. Rhodes is willing to share and, Mr. Sadow, what you think under the rules you're entitled to.  If you think that what she's offering you is not enough in terms of exhibits and explanations, then let me know.  I'll be glad to get on the phone with y'all and talk about it.

MR. SADOW:  Thank you.

THE COURT:  All right.  Mr. Sadow, anything further from your perspective that we need to address today in this matter?

MR. SADOW:  No, Your Honor.

THE COURT:  Okay.  What about, Mrs. Rhodes, anything further from your perspective?

MRS. RHODES:  I'm sorry, Your Honor.

THE COURT:  That's okay.

MRS. RHODES:  I am being sent notes and trying to pay attention.

THE COURT:  Sure.

MRS. RHODES:  Apparently, Mr. Benton has something he wanted to say.

THE COURT:  Mr. Benton?

MR. JAMES BENTON:  Your Honor, I just wanted to clarify I think what happened here was Mr. Bercini presented us

six as staff simply to just be in the presence of the court and that was only to the gentleman who let us in the court, sir. We in no way said we had any type of legal representation at all, sir.

THE COURT:  Okay.

UNIDENTIFIED MALE SPEAKER:  And I agree meaning I wasn't trying to push my way through.  I was just trying to say we know the -- and we wanted to be in the court.

MR. JAMES BENTON:  He said "staff" as just for seating arrangements sir.

UNIDENTIFIED MALE SPEAKER:  Yes.

MR. JAMES BENTON:  That's all that was.

UNIDENTIFIED MALE SPEAKER:  Yes.  There was no trying to swindle ---

THE COURT:  So, Mr. Grandy, you're the one who made this representation; is that right?

MR. RANDY BERCINI:  I believe when I told them I just said that we were staff and that we were wanting to be able to come in.

THE COURT:  Staff of what?

MR. RANDY BERCINI:  I do lawn maintenance at the house.

THE COURT:  No, but when you -- tell me exactly what you said to the Court Security Officer to gain access to the courtroom.

MR. RANDY BERCINI:  The one in the front?

THE COURT:  I don't know.  Everybody.

MR. RANDY BERCINI:  I'm sorry, sir.

THE COURT:  Anybody.  Anybody that you came in contact with here that is a Court Security Officer --

MR. RANDY BERCINI:  Yes, sir.

THE COURT:  -- to gain access to this courtroom --

MR. RANDY BERCINI:  Yes, sir.

THE COURT:  -- what did you say to him or her?

MR. RANDY BERCINI:  I just told them that we were immediate staff and could we go in and that was all I asked.

THE COURT:  Immediate staff of what?

MR. RANDY BERCINI:  Meaning we just help work.

UNIDENTIFIED MALE SPEAKER:  Immediate staff to Mr. Denis, sir.

UNIDENTIFIED MALE SPEAKER:  Mr. Denis ---

UNIDENTIFIED MALE SPEAKER:  It was they came in just to simply take notes to be here and to observe.  He presented it because the restraints of the court and spacing that we were staff so that we could come in along with immediate family members, sir.  It was as simple as that and it all happened ---

THE COURT:  So if the Court Security Officer said that y'all represented you were legal staff ---

UNIDENTIFIED MALE SPEAKER:  No.

UNIDENTIFIED MALE SPEAKER:  No, no, no, no.

UNIDENTIFIED MALE SPEAKER:  We never said that.

THE COURT:  -- Court Security Officer ---

MALE SPEAKER:  No, sir.  No, sir.

THE COURT:  -- or that you represented yourself as being a staff member of some entity other than this church ---

UNIDENTIFIED MALE SPEAKER:  No, sir.

THE COURT:  -- that's incorrect?

UNIDENTIFIED MALE SPEAKER:  No, sir.  No, sir.

MS. KARINA ACOSTA:  That's absolutely incorrect.  Let me help them.  One, we have the right to remain silent.  You cannot make them talk, sir, and, two, yes, it was an absolute mistake.  That's all we said and then the chairs were offered to us after the fact so room could be made and after that I am not saying anything else and I don't have to say anything else.  Thank you, sir.

THE COURT:  Okay.

UNIDENTIFIED MALE SPEAKER:  Your Honor, she did not speak for all of us.

MS. KARINA ACOSTA:  Okay.  For myself.  I spoke for myself.  All right.  But we don't have to say anything.  Nobody did anything wrong.  It was a mistake like he just said.

THE COURT:  Okay.

UNIDENTIFIED MALE SPEAKER:  And we understand, Your Honor that's what you're trying to get to so I just wanted to simply clear it up.  That's what happened right outside was

just ---it would not even have been mentioned.  It was just because the restraint, the size of the courtroom that is -- he mentioned us as staff simply because we serve Mr. Denis in the church and others in different positions and so that's how Mr. Bercini presented it.  It had nothing to do with legal.  It had nothing to do with representing the court or representing anything other than that.  It was just simply that's all he said and we had no idea that there was any type of impropriety in it, sir.

THE COURT:  Okay.  Well, Ms. Acosta, let me disabuse you of one notion --

MS. KARINA ACOSTA:  Yes, sir.

THE COURT:  -- and that is your seeming belief that you can walk in this court and make misrepresentations and bring contraband in here and me be powerless to investigate and take immediate action.

MS. KARINA ACOSTA:  Yes, Your Honor.

THE COURT:  If that is your understanding of the Constitution --

MS. KARINA ACOSTA:  No, Your Honor.

THE COURT:  -- and the laws of the United States, then you are woefully mistaken.

MS. KARINA ACOSTA:  Thank you, Your Honor, for correcting me.

THE COURT:  If nothing further, we're adjourned.

MR. JACOBS:  Your Honor?

THE COURT:  Yes, Mr. Jacobs?

MR. JACOBS:  If I may, I know you asked counsel if -- co-counsel -- if there were any additional questions.  One question the United States has is did the other individuals know that he had a recording device with him -- that Mr. Derby had a recording device.

THE COURT:  I think we've covered the waterfront here today.  All right.

MR. JACOBS:  Thank you, Your Honor.

THE COURT:  Court's adjourned.

UNIDENTIFIED MALE SPEAKER:  Your Honor, Mr. Derby -- when he came in he gave me this.  I did not know it was a recording device.  He simply gave me a pen.  I did not want to make an issue of it, but this -- I did not know this was a recording device.  He gave it to me when he came in the court, sir.

THE COURT:  None of this ---

UNIDENTIFIED MALE SPEAKER:  It is a pen.  I have no intention -- I don't know if it's on, off.  I had no intention of recording anything, Your Honor.  I didn't want to -- he gave it to me.  I don't want to complicate everything.  I am not trying to record anything.  I don't know if it's on or off, sir.

THE COURT:  And that's the recording device; right?

UNIDENTIFIED MALE SPEAKER:  I do not know, sir. Mr. Derby -- when he came in he simply gave me a pen.

THE COURT:  All right.  Well, let me have that one, too.

UNIDENTIFIED MALE SPEAKER:  Yes, sir.

THE COURT:  Anybody else got a pen on them --

UNIDENTIFIED MALE SPEAKER:  No, sir.

UNIDENTIFIED FEMALE:  No, sir, Your Honor.

THE COURT:  -- that someone asked them to carry in the courtroom today?  My God, people.  And the explanations you've given me today about this reek of dishonesty.  So you need to buckle up and do better next time.

UNIDENTIFIED FEMALE:  Yes, Your Honor.

UNIDENTIFIED MALE SPEAKER:  Yes, sir.

THE COURT:  You're lucky you're leaving here today. Court's adjourned.

(End of Transcript of Record.)

CERTIFICATE OF OFFICIAL REPORTER


     I, Lisa H. Davenport, Federal Official Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of record of the digitally-recorded proceedings to the best of my ability and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


_____

Lisa H. Davenport, RPR, FCRR
Federal Official Court Reporter