```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF GEORGIA
                        AUGUSTA DIVISION


United States of America,     )
                              )
          Plaintiff,          )
                              )
     vs.                      )     Case No. 1:25CR62
                              )
Dennis Nostrant, Gerard       )
Robertson, David Reip, and    )
Marcus Labat,                 )
                              )
          Defendant.          )
_____)



              STATUS CONFERENCE ON BOND CONDITIONS
               BEFORE THE HONORABLE BRIAN K. EPPS
                UNITED STATES MAGISTRATE JUDGE
             WEDNESDAY, OCTOBER 15, 2025; 9:33 A.M.



FOR THE PLAINTIFF:

     Patricia G. Rhodes, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT NOSTRANT:

     Holly Grace Chapman, Esquire
     Davis, Chapman, and Wilder, LLC
     1143 Laney Walker Boulevard, Suite 201
     Augusta , Georgia 30901
     (706)426-4183

FOR THE DEFENDANT ROBERTSON:

     Christopher Troy Clark, Esquire
     Gillen Lake & Clark, LLC
     1450 Greene Street, Suite 3600
     Augusta, Georgia 30901
     (706)631-4925
```

FOR THE DEFENDANT REIP:

       Charles H. Rollins, Esquire
       Rollins, PC
       2224 Kings Way
       Augusta, Georgia 30904
       (706)627-1708

FOR THE DEFENDANT LABAT:

       D. Brooks Hudson, Esquire
       Hull Barrett, PC
       801 Broad Street, 7th Floor
       Augusta, Georgia 30903-1564
       (706)722-4481

TRANSCRIBED FROM DIGITAL RECORDING BY:

       Lisa H. Davenport, RPR, FCRR
       Post Office Box 5485
       Aiken, South Carolina 29804
       (706)823-6468

(Call to Order at 9:33 a.m.)

THE CLERK:  The court calls case number 1:25CR62. United States of America versus Denis Nostrant, Gerard Robertson, David Reip, Marcus Labat.  Patricia Rhodes for the government.  Holly Chapman for Mr. Nostrant.  Troy Clark for Mr. Robertson.  Charles Rollins for Mr. Reip.  Brooks Hudson for Mr. Labat.  Here for a status conference and review of bond conditions.

THE COURT:  Good morning, everybody.

(Group responds simultaneously.)

THE COURT:  Mrs. Rhodes, I appreciate your office taking on the, you know, burdensome task of thinking about these issues and talking individually with all the defense lawyers about these important issues of what to do pretrial. What's the best way you think for us to proceed today in addressing their concerns?

MRS. RHODES:  So I will just give the Court a little background on what I did and then kind of had to call on the Court for assistance.

THE COURT:  Sure.

MRS. RHODES:  I got from each of the lawyers here today a proposal of what they wanted for their client and then I tried to look at them side by side to see if there were ways for us to accommodate their requests which mostly are surrounded around attending services at the House of Prayer and

I think that -- I worked on a few of them and then when I got to one particular request I thought, well, there is just no way for this to work and that -- and I -- just for the record I've spoken with Mr. Clark yesterday about this and that was Mr. Gerard Robertson's request because he is a preacher at the church and wanted to continue to preach for two Sunday services, a Tuesday service, a Thursday service and attend noon prayer meetings.  I assume those are every day.

And the problem with that, Your Honor, of course, is, number one, I have no idea what is being preached and what is -- I mean, for all practical purposes it could be that the federal government is the spawn of satan and no one should cooperate.  I mean, that -- I don't know a way in which to enforce bond conditions where we are put in that position and so at that point I realized that I wasn't going to be able to craft any type of reasonable accommodations where the probation office could enforce the condition that the defendants are not to have contact directly or indirectly with any witness, victim or defendant if we have one of the defendants preaching across the pulpit and so that was when I reached out to the court with the defendants together to see if we, you know, could somehow work something that is both acceptable to the government and workable by probation and I'm not -- I am still not sure we can get there.

THE COURT:  Right.

MRS. RHODES:  But I just felt like I was sort of spinning my wheels and getting nowhere and needed to have at least some guidance on where we should go.  I don't know if that helps the Court.

THE COURT:  Well, I mean, the main thing you're talking about the preaching part and I've thought about it a lot over the last couple of weeks and it is a big problem.

MRS. RHODES:  It -- yes.

THE COURT:  And, you know, even if you don't say the government is the spawn of satan, then, you know, what if you just give a sermon on loyalty, you know?  How is a member of the church going to interpret that in the present context?  Very much either intentionally or without any intention whatsoever what you say in that context when you have such an extreme amount of influence over the people that are there to hear you preach can be very concerning, I think, in terms of balancing the need for the administration of justice and that, you know, very important safeguarding witnesses and victims.  I think everybody here understands what I'm talking about; right?

And I say it all the time -- the very cornerstone of this entire judicial process is the ability of a witness to take the stand, be sworn under penalty of perjury to tell the truth and to tell the truth in every respect without any reservation or concern about their own wellbeing or the wellbeing of their family or any advance repercussions to them

whatsoever, and in particular in this case when you have these allegations of such coercion, intimidation, et cetera, of church members, that ability to safeguard witnesses and victims is something that we've got to err on the side of protecting.

We cannot err on the side of allowing these defendants to have the freedom to do what they prefer to do between now and the time of trial.  We have to err on the side of protecting potential witnesses on both sides.  We want to protect witnesses who want to testify on behalf of the government and we want to protect those witnesses who plan to testify on behalf of the defense and those who are right now maybe undecided about what they want to do.  So we have to err in every respect on the side of administering justice and safeguarding these people as we move through this very important process.  If you take away that protection, the entire system of justice just doesn't function the way that it's supposed so.

So, Mr. Clark, what are your thoughts on this first issue that she's raised about your client being able to preach?

MR. CLARK:  Your Honor, we actually spoke yesterday afternoon as she was saying.  I spoke to Mr. Robertson at great length.  He agrees that he will not be preaching anymore.

THE COURT:  Okay.

MR. CLARK:  I thought that might be a concern of both the government and the Court.  I relayed that to AUSA Rhodes

7

yesterday afternoon.

THE COURT:  Okay.

MR. CLARK:  We have worked diligently to craft what I believe are some clarifying language and some conditions to section 7.  With that said, though, I will add, you know, we do have some serious concerns related to the first amendment protections in this context.  I don't know that we need to get into that today, but what we are talking about is not simply a preference.  It is a constitutionally protected right to practice their religion as they see fit and that is important -- not only to my client or the rest of the defendants, but to all of the members of this congregation.  It is something that I would ask the Court to keep in front of mind as we're discussing these today is we're discussing a different condition in many ways than their ability to access financial information, for example.

We totally understand.  We totally understand the concerns for coercion and other issues, but because of the First Amendment rights that are implicated in going to church or preaching or doing whatever other religious activity that they feel is necessary to carry out their faith, this is a very delicate issue and delicate concern and so we appreciate the Court's thoughtfulness on this.

All that said, though, as I talked with AUSA Rhodes yesterday we agreed that he would not be speaking and he agreed

not to speak in deference to this court and to the process in which we're at now. So that's kind of where we are, Judge.

THE COURT: Okay.

MR. CLARK: I've made some notes on what I thought may be some good amendments to 7G, but I don't want to step on anyone's toes. I am happy to discuss that if you would like, but we are fine with not having him preach at this time.

THE COURT: Okay. You know, I always say that to me one of the defining characteristics of an excellent advocate is the ability to not just argue everything to the hilt but to use reason and to sacrifice arguments for the sake of others you might want to make in a case and so I appreciate you conceding that issue because it has been very much on my mind and, you know, if you hadn't conceded it I probably would have sided with the government on that for the reasons I have already talked about. So I appreciate your concession in that regard.

All right. So we've got that off the table and I am not sure where to go next. I can either come back to you, Mrs. Rhodes, and have you go through what you think are the other major points of contention or I can go to each defense counsel and talk individually with them about their client and their particular needs.

MRS. RHODES: I mean, I can -- I do have what they requested and I can let the Court know what that is and what our position was going to be.

THE COURT:  Sure.

MRS. RHODES:  And then I will -- I do want to ask one question, though, that -- and, again, you know, the government is coming at this from the point of I don't know exactly what this schedule of services is.  I mean, just based on what I have read it appears that there are two services on Sunday.  It appears that there is a noon prayer meeting I presume Monday through Friday, but I don't know that for sure.  It appears that there is at least a Tuesday night Bible study and a Thursday night mid-week service and so I say that just to let the Court know that I am making some presumptions about the services and when they are and how frequently, and with all of that to say there was information during the course of the investigation that at times -- I don't know what the status of it is currently, but at times there was a system that was in place and it was called the polycom system; that is, it's somewhat -- I would analogize it to a conference call line.

It's like a line where numerous people can be on that system to hear.  It is like a live stream and, in fact, I guess I'll just ask very candidly -- I don't know if there is a live stream of any of these services which would take care of a lot of problems if there is, I think, but, in any event, I don't know what the status of that is today; that is, the polycom system or whether or not there is a live stream from this facility.

THE COURT: Well, and when you say a live stream I guess where you're going from that is it allows monitoring by the probation officer?

MRS. RHODES: Well, or that the attendance can be through live stream.

THE COURT: Oh, I see. So the topic that we're talking about now is whether these defendants can attend services?

MRS. RHODES: Yes, I mean, the proposals from each of the defendants was that they would be -- and I am going to talk in general terms and then I can talk more in specifics, but that each of the defendants asked to be able to attend certain services. They proposed that they would put into place certain spatial limitations between people -- defendants, I guess known witnesses or known victims -- and, you know, each of them provided specific dates and times of the week when they would attend.

I believe one of the defendants offered to attend the Spanish services which didn't seem to be an issue because I don't think any of the other defendants were attending the Spanish services. That being said, I don't know if there is any witnesses or victims that are attending that. That was something that it was virtually impossible for me to try to sit down and figure out at this juncture in the case who is a witness, who is a victim, because every single day that is an

evolving list, and, frankly ---

THE COURT:  Well, that will continue to change all the way up until trial, I would think; right?

MRS. RHODES:  Exactly.  I mean, it could change in trial.

THE COURT:  Right.

MRS. RHODES:  I mean, that's the problem and just to sort of reiterate the point, it will probably be a very large witness list, and so, you know, I did sit down to try to think if I could manage that, but then to lay on top of that I don't know who is a member of the church.  I don't know who all attends these services and so it is a virtual impossible task for someone in the government including probation to undertake to figure out who do we have to -- because there was one point where I was asked to sort of identify these people.  There is just no way at this juncture for me to do that.

THE COURT:  All right.  So that's the second issue. We've already dealt with the preaching thing.  Church attendance, whether these defendants can attend, and, if so, what will be the restrictions.  What are the other major topics?

MRS. RHODES:  I think that was pretty much it.

THE COURT:  Okay.

MRS. RHODES:  It is just, you know, I was wanting to be able to allow these people to attend their church if they

wanted to attend it.

THE COURT: Right.

MRS. RHODES: And I just -- in an effort to try to structure it, it just got to be unwieldy --

THE COURT: Right.

MRS. RHODES: -- to the point where I didn't know how I could impose -- or at least come up with a reasonable proposal that seemed reasonable but then could be enforced by probation.

THE COURT: Right.

MRS. RHODES: That was -- you know, it felt like we would have to have a probation officer to sit at --

THE COURT: Right.

MRS. RHODES: -- every one of these services and that's where I landed and so that's why I am here.

THE COURT: Right. It is just so difficult to police. I had -- I did a little bit of looking into this issue of constitutional rights in the context of pretrial release and whether there are any limitations on my ability to impose restrictions, and I certainly welcome any briefing from defense counsel or the government in that regard if you found anything enlightening.

I just didn't find a lot, and, I think, you know, that my opening thought on it is probably my closing thought absent some guidance from the lawyers which is that if you have the

13

authority to put someone in jail until trial, then any less restrictive things that you would impose are fully within the authority of the court to impose; right?  So if I can not only tell you that you can't attend church and you can't preach, but you can't even go home -- right? -- if I have that authority, then I think anything less than that is within the full authority of the church -- I mean of the court, but, certainly, subject to any authority that defense counsel would like me to review in that regard.

Okay.  Anything else, Mrs. Rhodes, from you in terms of opening thoughts or issues before I turn to defense counsel?

MRS. RHODES:  No, Your Honor.

THE COURT:  Okay.  So let's just go in order.

Ms. Chapman, tell me what your client and what your concerns are.  Well, first of all, I don't think the government will oppose the motion that you filed yesterday in terms of the listing some of the restrictions as described in your motion.

Mrs. Rhodes, you don't have any objection to that?

MRS. RHODES:  No, Your Honor, and this relates to the employment and being able to ---

MS. CHAPMAN:  To travel.

MRS. RHODES:  Yes, to travel --

THE COURT:  Right.

MRS. RHODES:  -- for purposes of appointments.

MS. CHAPMAN:  Yes, with life's appointments.

THE COURT:  Right.

MRS. RHODES:  We do not oppose that.  I would say, Your Honor, that the probation office called me last week and they wanted to make sure that we amended the order of his release to include that so that the probation office is on notice that he is exempt from the work requirement because he cares for his wife.

MS. CHAPMAN:  Yes, and the probation let him know which is why I filed that motion to make sure it was ---

THE COURT:  Well, I -- certainly, Mr. Nostrant, first of all, I wish your wife, you know, in terms of her health that it improves significantly, and I appreciate the fact that you're a devoted husband who wants to take care of her and we want to make sure that you have the ability to do that, and so no work requirement as we talked about before, and in terms of travel restrictions, I will guarantee you this:  If you need to take her anywhere to get treatment inside the district, outside the district, we will give that ability to you.

DEFENDANT NOSTRANT:  Yes, sir.

THE COURT:  You just need to be in communication with your probation officer to let them know what's going on.  If you have regular visits in Aiken, South Carolina maybe or Columbia or Charleston, et cetera, really anywhere in the country that you need to take her for treatment, if you just let them know your schedule they're going to give you that

permission.

DEFENDANT NOSTRANT:  Yes, sir.

THE COURT:  They just need to know when you're going to be gone for that purpose.

DEFENDANT NOSTRANT:  Yes, sir.

THE COURT:  Okay.

MS. CHAPMAN:  Thank you, Your Honor.

THE COURT:  All right.  Ms. Chapman, what else?

MS. CHAPMAN:  Your Honor, regarding the church attendance my client's goal was to hopefully attend the 8 p.m. Sunday church service and then the Tuesday Bible study which is also at 8 p.m. in the El Salvador building.  Those were the two weekly attendances that we requested, and, you know, within whatever bounds Your Honor thinks is appropriate, but our proposal just involved not sitting, you know, near any known defendant or known witness, but at this point I don't know who those people may be, but.

THE COURT:  Okay. All right.  Anything else?

MS. CHAPMAN:  That's -- that's it.

THE COURT:  All right.  Then, let's -- Mr. Clark, anything further that you have in terms of concerns?

MR. CLARK:  Your Honor ---

THE COURT:  You said you had some modifications that you had worked on.

MR. CLARK:  Yes, Your Honor, a couple of things.  I do

16

believe that there may be some restrictions if the Court would want briefing on it, we may be able to -- Mr. Rollins and I spoke before the hearing.  He's done some research on RFRA, Religious Freedom Restoration Act.  I believe that is what would potentially apply in this context.

THE COURT:  Okay.

MR. CLARK:  Like the Court, we didn't find all that much either, but we did find a few cases about the application of First Amendment either through the First Amendment itself or through RFRA to bail hearings.  That said, I would actually start at the Bail Reform Act itself.  In 3142(c)(1)(B) it talks about the least restrictive means or further combination of conditions and so what needs to be imposed if bail is granted it is the least restrictive means to ensure that the court's concerns are met and in the Bail Reform Act it talks about how the contents of the release order must be sufficiently clear and to allow the defendant to know what is expected of them and I think the court knows that.  I've told him you would say hang it on your mirror is what you've said at the hearing.  Learn it.  Know it.  And the Bail Reform Act actually points out the contents of the release need to be sufficiently clear to allow each defendant to understand what is expected of them, and so I think that's our two concerns.

One is right now it is not sufficiently clear because of the changing nature of a witness or victim which will change

all the way up to trial and so, theoretically, someone who is a witness or not a witness now could be in the future and vice versa and that could create ambiguity which would create a potential violation unknowingly.  The other is the attendance of church services.  He wants to attend -- not to preach, but to attend the Sunday services, the noon Bible studies and the Tuesday and Thursday Bible studies as well.

Talking to my client as it would relate to condition 7G we have come up with no contact with a co-defendant.  If they are attending the same service, we're certainly open to spatial limitations and things like that, but no contact with any co-defendant.  I think one line that is easier to draw than some in this case is between former members and current members and so if we were to say no contact with former members I believe that may allay some of the Court's concerns as to who may be a victim and a witness.

I don't want to read into the government's case, but I am assuming that if they have left the church they're more likely to be considered a victim or a witness than a current member of the church and so no contact with former members of the church and then we would say no contact with anyone the defendant knows or reasonably should know is a current member of the congregation who is also a potential victim or witness and then allowing them to attend those services.

I think that those safeguards as phrased like that

would allow them to attend services and would also allow the safeguards in place but also bring some clarity to the issues as well.

THE COURT:  That last thing you said -- no contact with anyone the defendant knows or reasonably should know and then I -- what was the last part?

MR. CLARK:  I would apply that to -- so no contact with co-defendants, no contact with former members, and then as it relates to current members, no contact with current members that the defendants know or reasonably should know is a victim or witness in this case which may be gleaned from discovery or, you know, maybe -- maybe, you know, Mrs. Rhodes calls and says, hey, this person is going to be whatever, we received a proffer and then that is a clear signal and indication at that point of the status of that person.

THE COURT:  Okay.

MR. CLARK:  But I think that would bring some clarity as well.

THE COURT:  All right.  Thank you for that.

All right.  Mr. Rollins?

MR. ROLLINS:  Yes, Your Honor.  As Mr. Clark said, I have been sort of researching this and I want to start again where he did with 3142.  I think that's where we start and just echo what he just said and, really, I think, you know, what I wanted to talk about specifically was 3142(h)(1) and that is

the, you know, contents of release order that must be sufficiently clear and specific to serve as a guide for the person's conduct.  We're making the same -- similar request to what other people are making.

Specifically, with regard to Mr. Reip, he is asking to attend service as a regular parishioner on Sunday morning which would be -- I don't believe is the same time anyone else would be attending and then because Mr. Reip happens to play the bass, he -- his wife and he can participate in the church as a band -- like a praise band that plays during services and I thought that was an ideal way for him to go and be able to participate.

My understanding is that there are no known -- no co-defendants and no known victims or witnesses to my knowledge in the band group and so the idea was that for the three -- I asked for him to go three times a week to different services and I believe we picked those out.  I don't -- but the idea would be for those he would go and play in the band.  So he would be -- for those particular services he is to go in, you know, sit -- go to the band area, do band stuff.

I mean, you talk about -- he is going to have to by necessity of just playing an instrument being in a band have to pay a little bit more attention to what's happening to catch the cues so there is not as much time for just social talk and I thought that was -- you know, it is a segregated area from

the rest of the church, but he is still attending.  It's not like the choir is not going to church; right?  Just with an extra activity which is, you know, nothing to do with anything improper.  I think he can safely play the bass.

You know, I'm concerned about -- I mean, my client says he wants to go to church.  You know, my criminal defense lawyer hat on, you know, I'm like I prefer that you never leave the house and don't talk to anyone; right?  You know, just generally that's my advice.  One of the things that's been troubling me about this case is I have been doing criminal defense for a long time and, you know, it's usually more like street crime stuff, but oftentimes when I am at a bond hearing or a bail hearing and I'm asking for bail or even the same thing at a probation hearing where the judge is putting conditions on my client and saying -- telling the defendant, you know, you better follow these and he means it and the judge will say to me oftentimes, you know, you, lawyer, make sure he understands when you go out here that I'm serious; you know, I am going to throw him in jail if he doesn't do that, and also a lot of times it'll be -- usually this is street crime.  This case is kind of strange -- you know, you'll have somebody charged with dealing drugs or some assault crime and who shows up?  Not their homeboys.  Not their friends who they're out there doing crimes with.  Mama and dad maybe and pastor a lot of times and often we're telling them go -- you're stressed

out.  Whether you're guilty or not, this is stressful; right?  It is traumatic.  You need healthy outlets.  Don't go drink.  Don't go do drugs.  Go to church.  Go spend time with your mama.  Go hang out with the friends of yours that your mama likes, not the ones that you like; right?  Stay out of trouble.

And so with us being afraid because we don't know who the universe of witnesses -- potential witnesses -- and victims are, what I've had to advise Mr. Reip is -- and to comply with these conditions is you really can't talk to anybody, and so, you know, I think -- I think that under post-*Hobby Lobby* with the RFRA decisions that it goes beyond what the First Amendment requires.  It put additional requirements on the government and there's a case *U.S. v Grady* was in the Southern District.  That was the King's Bay demonstrators and they didn't pass the RFRA test, but it was applied.

There was another case out of -- there was precious little on bail release, what it had to do with RFRA.  I found one case that I want to bring to the Court's attention even though it is out of the Southern District of Indiana.

THE COURT:  Sure.

MR. ROLLINS:  It is 2021 WL 1588941 and it's *U.S. v Elliott*.

THE COURT:  15889 ---

MR. ROLLINS:  1588941.  And, again, that is the District Court, Southern District of Indiana.  So not the

strongest --

THE COURT:  That's okay.

MR. ROLLINS:  -- precedent to cite --

THE COURT:  No, I ---

MR. ROLLINS:  -- but it was just --

THE COURT:  Any precedent on this.

MR. ROLLINS:  -- it's some precedent.  It was slightly different because this person was -- and the facts are very different when you get into the case.  I mean, there is very clear reasons why this guy in this case is very different than any of these defendants, but it was applied and I think that the analysis if it's applied here would say if that is accurate to apply it which I would be willing to brief and argue that it is that this -- that they have -- I don't think there is a real argument that they don't have a sincerely held belief that this is a religious practice.

THE COURT:  Right.  I don't doubt that.

MR. ROLLINS:  And it is a substantial burden.

THE COURT:  Right.

MR. ROLLINS:  If RFRA applies, then that means that so if those three things are true, then is it a compelling government interest?  Yes, absolutely.  You know, preventing the obstruction of justice, maintaining the orderly, you know, disposition of justice -- all the things that you mentioned -- protecting witnesses, protecting the community from further

crime -- these are absolutely compelling government interests. No argument.

It would just be so if all of those things are true, then it must be the least restrictive means to accomplish those compelling government interests which, again, no argument about the compelling interests or all the rest of it. It is just is this the least restrictive means and if RFRA applies which we'll argue that it does, then it shifts the burden and it's not -- and it can't be satisfied. There are courts that say -- cases that say it can't be satisfied by substituting it -- for example, attending over video conference or getting credit for some older cases it said pre-*Hobby Lobby*, pre-*Ramirez v Collier* which is -- and, again, I can brief this and I have not, but this is 142 S. Ct. 1264 or 595 U.S. 411, Supreme Court case, and *Holt v Hobbs* which is 574 U.S. 352, another Supreme Court case, again, just applying RFRA. And the *U.S. v Grady* which is the Eleventh Circuit case which, as I said, was the King's Bay demonstrators. It was applied.

They didn't pass the -- I mean, they got through the sincere religious belief. It was a real exercise. It was a burden, but then it was a compelling government interest that they did not meet the criteria to satisfy. I think, you know, they use it as a defense in their trial that review was post-conviction.

I think it's important to note that Mr. Reip is

24

innocent until proven guilty, has never been convicted of a crime.  The accusations in the Indictment that are particularly related to him are sparse.  There is only one -- only one paragraph in the entire Indictment that lists him and him alone taking an action and that's paragraph -- I think it's -- but it says -- paragraph 82 in the Indictment, it says he used a bogus and forged POA, but, I mean, without even getting -- I have no idea what the government's evidence is.  I haven't been able to review discovery, but, I mean, like he might not have known it was bogus and forged and so there's -- so there's -- I don't see any specific allegations in here that say that he is going to -- that make it clear that he's a threat in some way.

I mean it's -- he wants -- you know, he wants to attend church.  He is not asking to violate other generally applicable laws and I think -- and I think that the government -- I think that some of the stuff that Mr. Clark recommended like reasonable things that can be done for example, you know, obviously, don't have any communication or sit near other co-defendants.  That's clear.  That list is clear, but the victims and witnesses which like the government said and I understand could be evolving.  I think that there is some burden on the government and whether that means putting a probation officer at the service, I think that might be something they have to do.

THE COURT:  No, I mean, that's one thing I won't do.

We don't have to bandwidth to manage and monitor defendants in that way.  It is just not possible.

MR. ROLLINS:  I understand your position.

THE COURT:  It's not a position.  It's just the reality.  It really is.

MR. ROLLINS:  Yes, sir, I just want to say these are the things that I'm thinking.

THE COURT:  Sure.

MR. ROLLINS:  And I will brief them more fully, but right now for the purposes of this I think that, essentially, the suggestions that Mr. Clark made, if those are acceptable -- and certainly right now -- we can address more of these issues later.  We can have further reviews of these conditions, but right now his primary concern is just getting back to church.

This not going is really stressing him out.  He feels religiously compelled to go, and, I mean, so I'm like do we really want to fight this but he really does and so with great caution I approach this saying let's do it, but I'm very worried that he is going to unintentionally violate and I don't want that to happen and he doesn't want it to happen either.  So that's our primary concern.

THE COURT:  Okay.  How long do you need to file that brief?

MR. ROLLINS:  If I could have two weeks to brief it.

THE COURT:  Seven days?

MR. ROLLINS: Seven days. I could do it in seven days. Yes, sir.

THE COURT: All right. Thank you, appreciate that. Anything further, Mr. Rollins? I hope I didn't cut you off. I wanted you to say as much as you ---

MR. ROLLINS: No, Your Honor. Honestly, if I am going to brief it, I think it would be better to brief it, put it there and then the government can brief in response and we can all be on the same page.

THE COURT: Okay. All right. So, Mr. Hudson what are your thoughts?

MR. HUDSON: Thank you, Your Honor. Judge, I would echo and adopt most of the arguments and suggestions already made by other defense counsel as it pertains to my client. Judge, I do think that Mr. Labat's situation is a little bit different and what he's requesting is a little bit different and I think we can craft something that will satisfy this court.

Number one, Your Honor -- and I think Mrs. Rhodes alluded to it -- my client is requesting to attend the Spanish language church with his wife, Your Honor. My understanding his wife is fluent in Spanish. She already attends those on Sunday. None of the other defendants attend that church and the building where those services are held is a separate building over 100 feet from the main sanctuary, Judge. So I

think that allowing him to do that would be acceptable, Your Honor.

There are no other co-defendants, no other victims or witnesses that we're aware of that attend that Spanish language service and I think that would, basically, give or satisfy his ability to attend church and also satisfy the government's concern that they would be around anyone that he shouldn't be around, Judge.  So that's number one.

Number two, Your Honor, my client has been teaching a Sunday school class to 5- to 7-year-old boys for many years every other Sunday.  The wing of the Sunday school, Judge, is even further away from the main sanctuary so there would be no interaction with any other co-defendants, known witnesses or anything like that.  My understanding, I believe, is the government doesn't oppose that request, Judge, at least based on our prior discussions.  So that's number two, Your Honor.

Number three, Your Honor, my client has been functioning -- he has an office at the seminary where he oversees a lot of volunteers, Judge.  Not a lot.  I shouldn't say that.  His only involvement really would be, number one, assisting with the production of the newsletter that the seminary sends out, production of the weekly church radio program, preparing curriculum for future classes of seminary. He informs me, Your Honor, that there are no co-defendants, no witnesses or victims that he would interact with.

As a matter of fact there are only three individuals that he would interact with while there, Your Honor. He's provided those names to me and I could certainly provide those to Mrs. Rhodes. From what my client tells me, Your Honor, I would be shocked if any of these folks were witnesses or victims and if I could provide those names to Mrs. Rhodes I think she might consent to that condition, Judge.

THE COURT: All right.

MR. HUDSON: And I can do that now or I can do that at a later date, whatever Mrs. Rhodes prefers. And, Your Honor, the last thing is, of course, we also have the condition or the request that he be allowed to go to these daily noon prayer meetings and, Your Honor, I would echo what's already been said. My understanding is the sanctuary is a very large building. I think we could craft some spatial restrictions as has already been alluded to where, you know, 20 - 25 feet separated from any co-defendant that might be there -- witnesses, co-defendants. I think all of those four requests are very reasonable from my client. I think they're very doable and I think we can craft those conditions in a way that it will alleviate, I think, the government's concerns and ensure that my client doesn't have any contact with any individuals that the court would be concerned about.

THE COURT: Okay. Thank you.

MR. HUDSON: Thank you, Judge.

THE COURT: Any final remarks about any of these?

MRS. RHODES: Yes, sir. I think that -- I do think that we can agree to some of these conditions on particular defendants. We do have sort of -- I'll give the Court our position on each one --

THE COURT: Okay.

MRS. RHODES: -- as the Court went through in order. As to Mr. Nostrant, I don't think we have any objection to his attendance at Sunday 8 p.m. and Tuesday 8 p.m. Bible study as long as there is some assurance of his -- and, Your Honor, I am going to go back to something that was said in one of our detention hearings and there is a level of trust here that just has to be there, and then, you know, the probation office will have to figure out a way to monitor this moving forward and I think they will. They will figure out a way, whether that's surprise visits to the church or -- you know, I don't know, but I think that I'm not trying to infringe upon these people's right to practice as they want to practice their religion.

I would point out that the difficulty in this case is that the church is the loci of the criminal conduct and so --

THE COURT: Right.

MRS. RHODES: -- we're just in this very awkward position, but in an effort to be reasonable here I would say we don't have any objections to Mr. Nostrant's proposal.

With Mr. Robertson's agreeing to not participate as a

pastor here, then we would agree with his request.  I will say -- I do want to point something out here.  I don't think it's -- I think it is a good idea to say no contact with co-defendants, former members or people that he knows or reasonably should know could be a victim or a witness.

I want to point out something that, you know, the government is receiving information on a very regular basis.  A stream of information is coming in to us on almost a daily basis.  We have been provided and I don't have a specific person or property that I can point to today, but we are receiving information that properties are being moved out of the names of the LLCs that they were put in and back into the names of the people who the mortgages are now on and these people are now being told "This is now your property".  Somebody is doing that and I don't know who is doing that yet, but I point that out to say there are properties that are probably being transferred back into the names of people who are attending this church and somebody is making that happen.

And so I point that out to -- for the Court to reiterate to these defendants that they cannot be involved in that, and, frankly, I am not sure that the transfer of those properties is legitimate anyway, but that's a different question.  And I say that because I know that Mr. Robertson's name is on a number of these properties as are some of the other defendants.

THE COURT: Well, let's talk about that for just a minute because as I think about that I don't know that there is a bond condition -- maybe there is -- that would prohibit -- I mean, really, what you're talking about is returning a property to the person who is the true owner, I guess you would say; right? So, I mean, number one, is the government opposed to that transaction back --

MRS. RHODES: I mean, I ---

THE COURT: -- to the real owner?

MRS. RHODES: It is difficult for us -- it is difficult for me to sit here and say, I mean, because I'm talking about potentially 200 different properties. I mean, it is -- we are at a point in time where -- and let me kind of back up and say some of these properties were purchased as long ago as 2005, '6, '7, '8 and then over time they are transferred into these LLCs and now -- and the person who got the mortgage in the first place has never paid a dime.

THE COURT: Right.

MRS. RHODES: And so now they're being transferred back into that person's name who now has to 15 years later figure out how to pay --

THE COURT: How to pay for it.

MRS. RHODES: -- the mortgage on it, so.

THE COURT: How to maintain it and all those things.

MRS. RHODES: Yes.

THE COURT:  So you're worried about the victims experiencing distress.

MRS. RHODES:  I mean, this is what's been created, Your Honor.

THE COURT:  Right, yeah.

MRS. RHODES:  So the government really can't -- we're in a little bit of a predicament of in terms of like are we -- I don't know that we're able to step in and prevent those transfers, but I will tell you that I do think that there will be victims and I use that term a little bit loosely made of people who cannot now pay the mortgage and it ruins their credit or they have to file bankruptcy or whatever the fallout results are.

THE COURT:  So and your concern is that one of these defendants may be, number one, coordinating these things, and, number two, either directly or indirectly communicating with these unfortunate people and putting them in a really big predicament and maybe even a position where they are subject to more influence or coercion.

MRS. RHODES:  Yes, sir.  I mean, and I'm not -- again, it's a little bit of a tangential issue to what we're talking about --

THE COURT:  Yeah.

MRS. RHODES:  -- in terms of the attendance at these services and I am trying to be as reasonable as possible and I

33

want to be reasonable, but I want -- I do want for these defendants to know that that information is coming in to us and it is not lost on the government that this is happening.  I mean, it's just part of ---

THE COURT:  Right.

MRS. RHODES:  It is part of what -- it is part of what the scheme -- the fall -- it's the fallout of the scheme that's set forth in the bank fraud charges of the Indictment.

THE COURT:  Well, when you say like that you're fine with Mr. Nostrant attending that service and you're okay with Mr. Robertson attending -- you haven't identified which ones, but some of the services at least, do you say that with a clear conscious or do you feel reasonably assured that they're going to abide by the bond conditions if they do attend church or are you doing this because you're being a little magnanimous?  What is your comfort zone and what's not your comfort zone, I guess is the question.

MRS. RHODES:  I'm somewhere in the middle.  I mean, that's not a good answer --

THE COURT:  Yeah.

MRS. RHODES:  -- but I am somewhere in the middle.  I mean, I feel like I hope that because the defendants have now been before the court a number of times more than any defendant who has yet to -- I mean, in a typical case where a person is indicted and they come before an initial appearance and

arraignment usually on the same day.  They might have a detention hearing that day.  I think these defendants have now been before the court at least three times, maybe four times before really anything has kind of gotten off the ground in this case in terms of the prosecution and I think the Court has made it abundantly clear that if there is a violation, we will be back here in court.

THE COURT:  Well, I'll tell you I've listened very carefully to every remark that has been made here today and I've been thinking about this for two weeks and walking in here today I really didn't have a clear thought either way, but this has been an extremely informative conversation and what I've heard several defense lawyers say is that we don't know who a witness is.  They're all potential witnesses and we don't know --

MRS. RHODES:  Yes.

THE COURT:  -- when we sit next to somebody in a pew whether we're talking to someone who is going to testify against me at trial, you know.  Not me, but them.  They don't know.  And it may be today they're not, but tomorrow they will and several of the lawyers said, "I'm uncomfortable with them being at the church because I don't want there to be a violation intentional or unintentional," and I just -- the more we sit here and the more I hear everybody talk, the more I think the best thing for everybody involved is for there to be

no church attendance, and I don't say that lightly.

I have been thinking about this and worrying about this. And I'm religious person. I try to attend church every Sunday, and I, you know, tell my kids all the time it's not enough for you to sit on your couch and watch the service. You need to be there, you know. To me that's true worship and it's very important to me, but I'm also a Judge and I also have to make sure that this case when it gets to trial and a jury is struck that a fair trial is conducted for everyone involved and I don't have that reasonable assurance of that occurring here given the allegations and the amount of influence the government alleges these defendants have over these people and so I don't feel comfortable allowing y'all to attend church until trial of the case. I just don't.

I don't think your lawyers are comfortable with it either. I think they are going to rest easier knowing that you're not there among all these people that are potential witnesses at trial. Just -- I don't have a comfort with it and I don't have a comfort with anybody going to the church and working in any capacity either. I just don't because any time you're there you're going to have that same potential for a conversation that should not take place and we can't police that. We just don't have the manpower to do it.

Now I am very concerned that I not overstep my authority and so in seven days if the defense counsel -- if

y'all want to take a look at the case law and then give me a brief that outlines if there are any limitations in this regard -- I don't think there are because, as I said, I can put all of these defendants in jail until trial if I felt like it was necessary, and, short of that I can put you on home confinement where you can't go anywhere at all or home imprisonment, basically and so I think I have full authority to do it and I think there is a compelling government interest here, a compelling court interest in making sure that this trial is fair for everyone as we've discussed. So I don't think there's such a limitation on my authority, but I certainly want to take seven days to consider that.

So what we'll do is leave here with the iron clad rule that you cannot attend church because of the great likelihood that you're going to have a conversation with a potential witness who is going to testify at trial and subject to that briefing I may change my mind if I see that the case law suggests I don't have the authority to do that. It's not easy for me to say these things. I promise you that. I know it's not easy for you to hear them, but right now it's absolutely necessary. All right.

Is there anything further from the government that we need to discuss today?

MRS. RHODES: No, Your Honor.

THE COURT: Anything further from any defense counsel?

If you have anything further ---

MR. ROLLINS:  No, Your Honor.  I think I can put this in the brief.  I was just -- I think I had neglected to add earlier to say that he also wants to be able to go to help drop his kid off at the school -- at church school.

THE COURT:  I think that's ---

MR. ROLLINS:  But I think Your Honor's ruling would be the same ---

THE COURT:  I think that's fine.  He can drop his kid off at the school.

MR. ROLLINS:  Right and ---

THE COURT:  He is not getting out of the car.  He is just letting the child out; right?

MR. ROLLINS:  If he could do that, that would be good.

THE COURT:  Absolutely.

MR. ROLLINS:  Okay.  Then he can do that.

THE COURT:  That's fine.

Mrs. Rhodes, you don't have any problems with that?

MR. ROLLINS:  And anything else we will put in the briefing.

THE COURT:  Okay.  All right.  Mr. Clark?

MR. CLARK:  Nothing else, Your Honor.

THE COURT:  Ms. Chapman?

MS. CHAPMAN:  Nothing, Your Honor.

THE COURT:  Mr. Hudson?

MR. HUDSON:  Nothing further, Judge.

THE COURT:  Okay.  Court is adjourned.  Thank y'all.

(The hearing is concluded.)

39

CERTIFICATE OF OFFICIAL REPORTER


I, Lisa H. Davenport, Federal Official Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of record of the digitally-recorded proceedings to the best of my ability and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


_____

Lisa H. Davenport, RPR, FCRR
Federal Official Court Reporter